**LIBERTY LEATHER CORPORATION,**
Plaintiff-Appellant,

v.

**Richard CALLUM and Willard Helburn,
Inc., Defendants-Appellees.**

No. 80–1553.

United States Court of Appeals,
First Circuit.

Argued Feb. 10, 1981.

Decided May 18, 1981.

Edward R. Lev, Boston, Mass., with whom Louis A. Rodriguez, and Sullivan & Worcester, Boston, Mass., were on brief, for plaintiff-appellant.

J. Owen Todd, Boston, Mass., with whom John J. Regan, and Hale & Dorr, Boston, Mass., were on brief, for defendant-appellee Richard Callum.

John P. White, Jr., Boston, Mass., with whom Michael H. Riley and White, Inker, Aronson, Connelly & Norton, P. C., Boston, Mass., were on brief, for defendant-appellee Willard Helburn, Inc.

Before COFFIN, Chief Judge, WINTER, Circuit Judge,* and SKINNER, District Judge.**

WINTER, Circuit Judge.

Liberty Leather Corporation (Liberty) appeals from orders of the district court (a) directing a verdict for defendants Richard Callum and Willard Helburn, Inc. (Helburn) on Counts I (fraud), II (breach of promise), and III (tortious interference with a business relationship) of Liberty's amended complaint, and (b) denying Liberty leave to amend its complaint to include a cause of action for interference with its discovery efforts. The district court also entered judgment for the defendants on the jury's verdict on Count IV alleging defamation and Liberty does not appeal from this action on its merits. It does argue that if entitled to a new trial on any other count a complete new trial, including a new trial on

---

* Of the United States Court of Appeals for the Fourth Circuit, sitting by designation.

** Of the District of Massachusetts, sitting by designation.

Count IV, should be ordered. We find no merit in its several contentions, and we affirm.

## I.

This diversity action arises from Liberty's unsuccessful attempt to purchase all of the stock of Helburn. Both Liberty and Helburn are corporations which buy animal hides for tanning and resale to makers of leather goods. Callum was president, a director, and owner of 38 percent of Helburn's stock. Rene Perrone is president and sole shareholder of Liberty. Beginning in 1978, with business failing, the Helburn shareholders sought purchasers of all of the corporation's stock. In January 1979, Callum met several times with Perrone to negotiate a purchase of Helburn stock by Liberty. On February 12, 1979, Perrone signed a written offer to purchase 100 percent of Helburn's stock for $688,000. At that meeting Perrone also agreed to employ Callum at $30,000 per year, but refused to assure Callum that he could continue to work in Maine or Massachusetts, the sites of Helburn's operations, rather than move to New York, the site of Liberty's.

Callum agreed to submit Liberty's offer to the Helburn shareholders. The dispute in this case centers around other representations which Perrone alleges Callum also made at that time and soon thereafter. The complaint alleges that Callum promised Liberty an opportunity to increase its $688,000 bid if another purchaser offered more. Perrone testified that Callum stated that he was "positive" Liberty's offer would be accepted. Perrone further testified that Callum called him on February 13, 1979, assured him that completion of the deal was "imminent," and advised him to stop purchasing New Zealand sheepskins because Helburn had a substantial inventory of such skins.

Two days later, on February 15, 1979, Callum met with Arnold Saltzman, of Seagrave, Inc., and secured a written offer by Seagrave to purchase all Helburn stock for $690,000. Saltzman agreed to employ Callum for about $30,000 per year and agreed that Callum could continue to work in Maine or Massachusetts. Callum admitted at trial that he preferred to remain in Maine or Massachusetts rather than move to New York.

According to Perrone, Callum telephoned him on February 15 or 16 to ask if Perrone would raise his offer to $750,000 and Perrone agreed.[1] Perrone asked whether he should communicate his new offer directly to other Helburn shareholders, but, he testified, Callum advised him not to do so because it would hurt his chances for success.

On February 20, Callum met with the Helburn Board of Directors and then with the shareholders. At neither meeting did he state that Liberty had offered $750,000 for Helburn stock. According to the testimony of two stockholders, Callum told the assembled shareholders that Liberty was backed by "Mafia money." The Helburn shareholders voted unanimously to reject Liberty's offer and accept the Seagrave bid.

After learning that his bid had been rejected, Perrone requested and was granted permission to address a March 9 meeting of Helburn's stockholders called for the purpose of reconsidering the Seagrave and Liberty offers. Perrone related to the shareholders the entire history of his communications with Callum, including his offer of $750,000 for the Helburn stock. In spite of Perrone's representations, the Helburn shareholders voted 60 percent to 40 percent to confirm their acceptance of the Seagrave offer. According to at least one shareholder, however, the vote was influenced by a statement of Helburn's corporate counsel that the earlier acceptance of the Seagrave offer was legally binding. On April 19, 1979, Helburn shareholders executed the final agreement to sell their stock to Seagrave. Liberty then instituted this suit.

## II.

Count I of the complaint stated a cause of action for fraud and deceit, alleging that

---

1. Callum testified that the conversation took place on the morning of February 20, and that Perrone volunteered to increase the bid to $750,000 "if necessary."

Callum knowingly made false representations upon which Liberty reasonably relied to its detriment. This count rested upon three statements allegedly made to Perrone: (1) Callum's assurance that a deal was "imminent" and that he was "positive the deal would go through;" (2) Callum's promise that Perrone would be given an opportunity to increase his $688,000 bid to match subsequent offers from other buyers; and (3) Callum's promise to convey and recommend the $750,000 offer to the Helburn shareholders. At the end of trial, the district court directed a verdict for Callum on the grounds that the first of the representations was not actionable and that the evidence failed to show that the other representations were ever made.

■ In reviewing the granting of a directed verdict, we have followed the generally accepted rule that, "[w]hen the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict," a directed verdict is proper. *Trinidad v. Pan American World Airways, Inc.*, 575 F.2d 983, 984 (1 Cir. 1978), quoting *Brady, Administratrix v. Southern Railway Co.*, 320 U.S. 476, 479–80, 64 S.Ct. 232, 234–35, 88 L.Ed. 239 (1943). We have emphasized that "a scintilla of evidence is not enough to warrant submission of an issue to the jury." *Id.*, quoting *Federal Ins. Co. v. Summers*, 403 F.2d 971, 974 (1 Cir. 1968). This is particularly true where, as in this case, the party seeking a directed verdict does not bear the burden of proof.

■ The district court found no legally sufficient evidence that Callum ever expressly promised Perrone that Liberty would have the opportunity to modify its $688,000 bid in the event that another prospective buyer offered a higher price. This finding is correct. The complaint alleges that the representation was made at the February 12 meeting. Although Perrone testified at length about that meeting on both direct and cross-examination, he never stated that Callum made such a representation at that time. The sole reference to any such representation occurs in Perrone's testimony concerning his conversation with Callum soon after the February 20 stockholders' meeting:

I [Perrone] asked him [Callum] two things: Why was our bid turned down, as he had told me previously that we would get another chance to increase our bid?

Perrone's testimony fails to state when or where the alleged promise was made or what sort of "chance" Perrone was to be given. No other witness made reference to the statement and Callum denied having made it. Perrone's single passing reference to Callum's statement constitutes at most only a scintilla of proof that the representation was ever made. Moreover, since we know nothing about the circumstances under which it was made, there is no evidence to suggest that Callum made the statement with the then present intent of breaking his "promise," and element essential to Liberty's cause of action for fraud. *Barrett Associates, Inc. v. Aronson*, 346 Mass. 150, 190 N.E.2d 867 (1963).

The district court likewise found no evidence to show that Callum expressly agreed to convey the $750,000 offer to the Helburn shareholders or to recommend the offer. Liberty does not dispute this conclusion but argues instead that a promise to present the offer may be implied from Callum's actions in soliciting the $750,000 offer during the telephone conversation of February 15 or 16, while simultaneously advising Perrone not to communicate personally with other shareholders.

■ We decline to disturb the judgment of the district court regarding this alleged misrepresentation. Perrone's version of the facts does not support a reasonable inference that Callum made the alleged implied promise with the then present intention not to perform. It defies logic to believe that Callum, if he intended at the time of the February 15 or 16 phone call not to deliver the $750,000 offer to the shareholders, would bother to solicit the offer from Perrone in the first place. Moreover, even if we were to ignore the logical inconsistency in Liberty's allegations, we could not adopt

its position. Liberty's complaint and its arguments in the district court all related to alleged express promises.[2] Its "implied misrepresentation" theory arises for the first time on appeal and, consequently, cannot form a proper basis for reversal. *See George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547, 558 n.17 (1 Cir. 1974), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975).

Finally, the district court refused to submit to the jury the misrepresentation claim based on Callum's assurances to Perrone that he was "positive" the "deal would go through." The court ruled any such statement a simple prediction and not an actionable false representation.

■ Callum argues, and Liberty concedes, that predictions of this nature generally are not actionable as fraudulent misrepresentations. Predictions as to future acts by other parties, here the stockholders, cannot satisfy the requirements of a cause of action for fraud because their truth cannot literally be known at the time they are made and because reliance upon such predictions is generally dismissed as unreasonable. *See, e. g., Pepsi-Cola Metropolitan Bottling Co. v. Pleasure Island, Inc.*, 345 F.2d 617, 622 (1 Cir. 1965); *Yerid v. Mason*, 341 Mass. 527, 170 N.E.2d 718 (1960).

Liberty asserts, however, that predictions concerning future events are actionable under Massachusetts law which controls here where the person making the representation has superior knowledge concerning the subject matter of the prediction. Liberty's position finds support in *Cellucci v. Sun Oil Co.*, 2 Mass.App. 722, 320 N.E.2d 919 (1974), *aff'd* 368 Mass. 811, 331 N.E.2d 813 (1975). *Cellucci* was a suit brought by the seller for specific performance of a contract to sell real estate to Sunoco. After the seller signed a written offer to sell, a local Sunoco

official assured the seller that the deal was "all set" and that acceptance of the offer by the Sunoco home office was merely a formality. In reliance on that statement, the seller ceased his negotiations with another buyer. When Sunoco decided not to buy, the seller sued and won specific performance on the theory that Sunoco, having represented through its agent that the deal was complete, was estopped from denying the existence of a contract. Although the cause of action was based on breach of contract and estoppel, the court's holding applies equally to a tort action for deceit:

> Although as a general rule representations as to future events are not actionable ... an exception has been recognized "where the parties to the transaction are not on equal footing but where one has or is in a position where he should have superior knowledge concerning the matters to which the misrepresentations relate."

320 N.E.2d 919, 922, quoting Williston, *Contracts* § 1496 at 373–74 (3 ed. 1970). *See also* Prosser, *The Law of Torts* § 109 at 728 (4 ed.).

■ While *Cellucci* does establish that representations as to future events may be actionable in limited circumstances, it does not relieve the plaintiff of the burden of showing that he suffered damage as a result of his reasonable reliance on the defendant's statements. Liberty failed to prove this element of its case. For the purposes of this opinion, we may assume that Perrone could reasonably have relied upon Callum's representations, when Perrone signed the $688,000 offer on February 12, that the deal was "positive" to go through and, in the February 13 telephone call, that completion of the sale was "immi-

---

**2.** In its reply brief, Liberty asserts that its "implied misrepresentation" theory was raised below through paragraph twenty-three of its amended complaint which alleges fraud arising from the "acts and conduct of defendants aforesaid." Our reading of paragraphs one through twenty-two, however, discloses no relevant act aside from the alleged express prom-

ises of Callum. Moreover, Liberty had ample opportunity to amplify its implied misrepresentation theory in its Memorandum in Opposition to Defendants' Motions for Directed Verdict and during oral argument before the district court, but failed even to mention the theory on either occasion.

nent." [3]  Continued reliance on such statements, however, was manifestly unreasonable after the shareholder vote of February 20.  Moreover, the district court may properly have found that continued reliance on Callum's statements was unreasonable as a matter of law after February 15 or 16 when, according to Perrone, Callum telephoned to request the increased offer of $750,000.  At that point Perrone received clear notice that his $688,000 offer, the basis of a supposedly "imminent" deal, did not represent a final arrangement awaiting only the formality of shareholder approval, but was instead the subject of continuing negotiation.[4]  Given that awareness, Perrone's continuing reliance on Callum's original assurances was unreasonable as a matter of law.[5]  See, e. g., Tull v. Mister Donut Development Corp., —— Mass.App. ——, 1979 Mass.App.Ct.Adv.Sh. 1023, 389 N.E.2d 447 (1979).

At best, therefore, Liberty established that it could have reasonably relied upon Callum's statements from the time they were made.  February 12 and 13, until Callum's call on February 15 or 16.  Liberty produced no evidence, however, that it took any action or refrained from acting in reliance upon those statements during that four or five day period.  In its brief, Liberty contends that it ceased buying New Zealand lambskins in reliance upon Callum's assurances.  However, according to Perrone's testimony, Liberty purchased its last shipment of 1500 dozen lambskins a few days after Callum's statements.  While Perrone also testified that Liberty ceased buying skins in March and April, its failure to act at that time could not have resulted from reasonable reliance on Callum's representations.

In summary, Liberty failed to produce evidence sufficient to present any of its fraud claims to the jury.[6]  It failed to show that two of Callum's alleged fraudulent statements were ever made.  While Callum's assurance that the deal was "positive" to succeed may have been actionable under Massachusetts law, Liberty failed to show that to its damage it acted or refrained from acting in reasonable reliance upon that assurance.

### III.

 The district court directed a verdict for Callum in Count III (tortious interference with a business relationship) but gave no reason for its conclusion.  The essence of Liberty's claim is that Callum slandered Liberty by making the "Mafia money" remarks at the shareholders' meeting, thereby inducing shareholders to reject Liberty's offer.[7]  Undoubtedly a cause of action for tortious interference with business relations may rest upon defamatory re-

3.  It is far from clear that the holding in *Cellucci* would support our assumption, however.  *Cellucci* involved statements by an experienced real estate dealer representing a corporate buyer made to an inexperienced seller.  The fundamental premise of *Cellucci*, that the parties were "not on equal footing," may be absent here, where both parties to the transaction are experienced businessmen.

4.  Perrone testified that the increased offer resulted from the rapid increase in the value of Helburn's inventory of skins.  This explanation seems less than compelling in light of the fact that the $688,000 offer had been executed only three days earlier with the intention that it would be considered by the shareholders at the February 20 meeting.  More significantly, Perrone's reasons for increasing the offer are not particularly relevant.  The simple fact that the offer was increased shows that negotiations had not been completed.

5.  This is especially evident in light of Perrone's admission that he was aware that Seagrave, among others, was interested in purchasing Helburn.

6.  The same is true with respect to its claims for breach of promise (Count II), since those claims rested upon the same alleged statements and required proof that damages resulted from reasonable reliance thereon.

7.  Count III also alleged that Callum intentionally failed to convey that $750,000 offer to the shareholders in an effort to prevent them from accepting Liberty's offer.  Since Liberty produced no evidence that Callum promised to deliver the increased offer, and since Liberty has never asserted, either in the district court or on appeal, that Callum had any independent duty to convey the offer, Count III could not be submitted to the jury on this theory.

marks such as these.[8] *See* Prosser, *The Law of Torts* § 130 (4 ed.); Restatement (Second) of Torts § 767(a), Comment c (1977). Since there was evidence that the "Mafia money" remarks were made, and since the remarks arguably may have influenced the shareholders' vote, we believe the district court erred in failing to submit Count III to the jury.[9] Nevertheless, we affirm the judgment with respect to Count III since, in light of the jury's response to the special questions submitted on Count IV, the slander count, it is apparent that the jury found that the alleged "Mafia money" remarks were never made and therefore the district court's error was harmless.

The jury answered "no" to the first question on the special verdict form, which asked:

> 1. Has the plaintiff persuaded you by a preponderance of the evidence as to each and every one of the following elements of slander; (1) that the statements were made by Callum (2) that the statements were defamatory (3) that the statements were published or communicated to a third person or persons and (4) that the publication of the statement without first ascertaining its truth or falsity was negligent under the circumstances?

By its instructions concerning the elements encompassed in the interrogatory to the jury, the district court removed the second issue from the jury's consideration. It instructed the jury that the "Mafia money" statements, if made, were defamatory as a matter of law. Callum's sole defense to the slander claim was that he never made the statements. He never asserted that the statements were innocently made, or that he had any reasonable basis for believing they were true. In fact, Callum testified

that he had no reason to believe that Liberty was in any way associated with the Mafia and that he had never heard even a rumor to that effect until after Liberty had filed suit. If the jury found that the statements were made, then Callum's testimony stands as an admission of gross negligence. Because Callum took this position at trial, there is no rational basis for concluding that the jury answered the interrogatory in the negative because it found that Callum did not act negligently in making the statements. Thus, in answering "no" to the first special question, the jury could only have concluded that Callum neither made nor communicated the alleged "Mafia money" statements to anyone. Since the jury's resolution of the factual dispute implicit in Count IV serves to reject the factual underpinnings of Liberty's claim for interference with business relations, we conclude that the failure to submit Count III to the jury was harmless error.

### IV.

■ Liberty finally argues that the district court erred in denying leave to amend the complaint to state a claim for "tortious interference" with its discovery efforts, despite the fact that it successfully moved to compel discovery pursuant to Rule 37 Fed. R.Civ.P. and was awarded $1200 in attorneys' fees by the district court. We see no abuse of discretion in the court's refusal to grant leave to amend the complaint to add a claim without legal merit. *See Countryside Casualty Co. v. Orr*, 523 F.2d 870, 872 n.3 (8 Cir. 1975) (sanctions provided by Rule 37 are exclusive remedy for abuse of discovery).

### V.

Willard Helburn, Inc. was included as a defendant on Counts I, II and III. Liberty

---

**8.** At oral argument and in a post-argument memorandum Callum argued that, under Massachusetts law, no action may lie for interference with a business relationship unless such relationship was in existence at the time of the alleged interference. The recent case of *Chemawa Country Golf, Inc. v. Wnuk*, —— Mass. App. ——, 80 Mass.App.Ct.Adv.Sh. 677, 402 N.E.2d 1069 (1980), however, specifically sustains a cause of action for interference with

*prospective* business relations. *See also Owen v. Williams*, 322 Mass. 356, 77 N.E.2d 318 (1948); Restatement (Second) of Torts § 766B (1977).

**9.** In fact, as Liberty points out, the district court acted inconsistently in submitting Count IV (slander) to the jury while directing a verdict on Count III.

alleged that, throughout the process of negotiation, Callum acted as agent for the corporation and that Helburn, as principal, was jointly liable for the torts of its agent. Because Helburn's liability is entirely derivative, and because we affirm the judgment for Callum as to all counts, it is unnecessary for us to address the question of agency, and we affirm the judgment for Helburn.

*AFFIRMED.*