Charles H. DESFOSSES,
Plaintiff, Appellant,

v.

WALLACE ENERGY, INC.,
Defendant, Appellee.

No. 87–1150.

United States Court of Appeals,
First Circuit.

Heard Sept. 16, 1987.

Decided Dec. 23, 1987.

Jeffrey A. Gorlick with whom Law Offices of Robert E. Weiner, Boston, Mass., were on brief, for appellant.

Stephen E. Weyl with whom Peter S. Cowan and Sheehan, Phinney, Bass & Green Professional Association, Manchester, N.H., were on brief, for appellee.

Before BREYER and SELYA, Circuit Judges, and LAGUEUX,* District Judge.

LAGUEUX, District Judge.

Appellant Charles Desfosses (hereinafter "Desfosses" or "plaintiff") brought this action for damages against Appellee Wallace Energy, Inc. (hereinafter "Wallace") for claims arising out of the nonrenewal of a gasoline service station lease and franchise agreement. Desfosses claimed that Wallace's failure to renew the franchise agreement violated the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801–2841 (1982) (hereinafter "PMPA") and that Wallace misrepresented its state of mind at the time it entered into the franchise agreement and thus committed the tort of deceit under New Hampshire law.

The District Judge heard the claims together; the deceit claim was tried to a jury while the PMPA claim was tried to the court. At the close of plaintiff's case, the District Judge directed a verdict for Wal-

lace on the deceit claim. At the end of the trial, the District Court rendered decision for Wallace on the PMPA claim.

The issue before this Court is whether the District Judge erred in making these two rulings. For the reasons stated below, we hold that Wallace complied with the PMPA and that Desfosses failed to produce enough evidence to go to the jury on the deceit claim. Accordingly, we affirm the District Court.

## I. BACKGROUND

Desfosses is a vigorous entrepreneur who has been successful in operating eleven motor vehicle service stations. He owns several of these stations outright and has leased others from their respective owners. Wallace is a distributor of motor vehicle and other fuels. Wallace supplies service stations with fuel and, in two or three instances, has entered into lease arrangements for the operation of the service stations.

In April, 1983 Paul LaBrecque, then general manager of Wallace, contacted Desfosses and persuaded him to visit a service station located at the Massabesic Traffic Circle in Manchester, New Hampshire (hereinafter "Massabesic Mobil" or "the premises"). The premises were owned by the Morris Rachins Trust (Trust) and leased to Mutual Oil Company (Mutual).

After Desfosses consented to enter into an operation agreement with Wallace, LaBrecque negotiated an "Indenture of Sublease" with Mutual. Under the sublease, Mutual granted Wallace a one-year tenancy of the premises from May 1, 1983 to April 30, 1984. The sublease also gave Wallace the option to purchase the premises from Trust for $135,000 on condition that Wallace give written notice to Trust "not less than sixty days prior to the termination of" the leasehold.

On April 28, 1983 Desfosses and Wallace entered into a "Lease/Trial Franchise" giving Desfosses tenancy of the premises for the same period afforded Wallace by Mutual.

---

* Of the District of Rhode Island, sitting by designation.

al. This agreement contained a specific reference to the existence of the under-lease:

> The term of this lease is subject to an underlying lease held by the Lessor, which lease expires on the 30th day of April, 1984. This lease shall automatically terminate 30 days prior to the expiration of the Lessor's underlying lease.

Exhibit 2 at Tr. 1–2.

On March 20, 1984 LaBrecque obtained from Mutual an extension of the Wallace sublease for an additional year. LaBrecque then orally advised Desfosses that he could remain in possession of the premises for an additional year under the same terms and conditions.

On July 9, 1984 Wallace Energy summarily dismissed LaBrecque from its employment. LaBrecque then contacted Mutual and Desfosses to express his interest in procuring an assignment of the Wallace sublease. Although Mutual and Desfosses initially advised LaBrecque that they would have no objection, Desfosses thereafter changed his mind and contacted Wallace.

On July 24, 1984, Desfosses met with representatives of Wallace to discuss the future of the franchise. Desfosses told them that he was happy with the business but did not want LaBrecque to become his landlord in the place of Wallace. The parties then entered into an oral franchise agreement whereby Wallace promised the following: (1) to exercise its option to purchase the premises; (2) to sell the premises to Desfosses at the cost of the price of the option plus the improvements at their depreciated value; and (3) to continue supplying Desfosses with gasoline after the closing of the sale unless and until Desfosses entered into a gasoline supply agreement with another dealer. Desfosses agreed to the following: (1) to obtain the necessary financing to purchase the premises; (2) to notify Wallace of that fact; (3) to purchase the premises from Wallace at the agreed price; and (4) to continue purchasing gas from Wallace until he entered into an agreement with another supplier. (App. 304).

At trial the parties disputed whether Wallace's obligation to exercise the option was conditioned upon Desfosses's notifying Wallace that he had obtained financing to purchase the premises. Wallace claimed that it was not obligated to exercise the option until Desfosses notified it that he had obtained the necessary financing. Desfosses claimed that Wallace's obligation to exercise the option was absolute. The District Court found, however, that "[w]hen the parties separated, it was understood that plaintiff was to arrange his financing for the purchase of Massabesic Mobil and notify Wallace, and Wallace would then proceed to exercise the option." (App. 304).

At the July 24, 1984 meeting Wallace also gave Desfosses a copy of the agreements between Wallace, Mutual, and Trust setting forth the term of the underlying sublease and conditions upon which the option had to be exercised. *Id.* The one page "Extension of Sublease" handed to Desfosses stated that Mutual agreed to extend the sublease with Wallace "for a period of one year commencing May 1, 1984 and terminating on April 30, 1985" subject to the same terms contained in the original "Indenture of Sublease." Exhibit 3B at Tr. 24.

The "Indenture of Sublease" also handed to Desfosses on that day described the method of exercising the option:

> LESSEE shall exercise said right and option by giving said Trustees notice by certified mail of its intention to exercise said right and option at any time not less than sixty (60) days prior to the termination of the term of this lease. If such notice shall not be given by LESSEE to said Trustees within such time, such right and option shall thereupon cease and terminate.

Exhibit 3A at Tr. 21. At trial, plaintiff and his office manager testified that they had read and understood the terms of these agreements at the time. Brief of Defendant–Appellee at 25 (citing Tr. II at 25; Tr. III at 85–86 (testimony of plaintiff's office manager, Jacqueline Trott)).

Subsequent to this meeting, LaBrecque contacted Wallace to obtain an assignment of the sublease of the premises. Wallace advised LaBrecque that it intended to exercise its option and sell the premises to Desfosses and therefore could not assign the sublease to LaBrecque.

Throughout the following months, Wallace contacted Desfosses concerning his progress in obtaining financing to purchase the premises. When it appeared that this financing would be delayed, Wallace made arrangements for a temporary loan from its own bank. With these funds Wallace intended to exercise its option and then resell the premises to Desfosses when he obtained the necessary financing.

Unfortunately, Wallace failed to calendar or otherwise remind itself of the sixty-day notice requirement of the option to purchase. Accordingly, on March 21, 1985, when Wallace advised its attorney to exercise the option, the attorney, after reviewing the necessary documents, advised Wallace that it was too late to comply with the sixty-day notice provision. Nevertheless, Wallace directed its attorney to attempt to exercise the option. The Trust, however, rejected the offer as untimely.

Wallace notified Desfosses by telephone of its difficulty in exercising the option. The company told Desfosses it would sue Mutual and Trust to enforce the option and that Desfosses need not worry. On April 10, 1985 Wallace brought suit in New Hampshire Superior Court to enforce the option.[1] On April 16, 1985, however, Wallace delivered to Desfosses a notice of the termination of the franchise. The parties agreed that, pending the outcome of the action, Desfosses could remain at the premises under the same terms and conditions as then existed.

In May 1985, while continuing to operate Massabesic Mobil, Desfosses leased a Getty motor vehicle service station across the same traffic circle. Desfosses then raised the fuel prices of Massabesic Mobil above the prices at the Getty Station. He also deposited property under repair on the premises of Massabesic Mobil.

On June 13, 1985 the Federal District Court of New Hampshire held that Wallace no longer had the right to exercise its option. Mutual requested that Wallace evict Desfosses so that Mutual could prepare for the summer travel season. When Wallace asked Desfosses promptly to vacate the premises at Massabesic Mobil, he "delayed and dissembled." (App. 307). It was not until July 24, 1985, that Wallace was able to enter upon and turn over the premises to Mutual. Because of plaintiff's delay in vacating the premises, and the condition in which he left them, Mutual sued Wallace. The resulting settlement required Wallace to pay substantial sums to Mutual. *Id.*

## II. THE PMPA CLAIM

Title 1 of the PMPA establishes minimum federal standards governing the termination and nonrenewal of franchise relationships for the sale of motor fuel. S.Rep. No. 731, 95th Cong.2d Sess., *reprinted in* 1978 U.S.Code Cong. & Admin.News 873. Congress, in enacting the PMPA, perceived a disparity in bargaining power between the large petroleum refiners and the small service station retailers. The PMPA was therefore designed to protect the retailers from arbitrary or discriminatory termination or nonrenewal of their franchisees. *Id.* However, Congress was also aware of the franchisors' need for adequate flexibility to respond to changing market conditions and consumer preferences. *Id.* at 877. *See also Veracka v. Shell Oil Co.,* 655 F.2d 445, 448 (1st Cir.1981).

To balance these distinct and often competing interests, the PMPA prohibits franchisors from terminating or not renewing the franchise agreement unless based on grounds described in sections 2802(b)(2) and 2802(c) and upon proper notice described in section 2804. While " 'the Act must be given a liberal construction con-

---

1. Defendants Mutual and Trust thereafter removed the suit to the Federal District Court of     New Hampshire.

sistent with its overriding purpose to protect franchisees,' *Brach v. Amoco Oil,* 677 F.2d 1213, 1221 (7th Cir.1982), we must also bear in mind that it constituted a diminution of prior rights of franchisors and thus should not be extended beyond the Act's language and purpose." *Russo v. Texaco, Inc.,* 630 F.Supp. 682, 687 (E.D.N.Y.), *aff'd,* 808 F.2d 221 (2nd Cir.1986).

Desfosses contends that Wallace violated the PMPA because it terminated him without complying with the requirements of sections 2802(b)(2)(C) and 2802(c)(4) or the notice requirements of section 2804.

### 1. *Compliance with Sections 2802(b)(2) and 2802(c)(4).*

■ Section 2802(b)(2) describes several grounds for lawful termination of a franchise. In terminating Desfosses's franchise Wallace relies on section 2802(b)(2)(C) which provides that termination is permissible if based upon:

> The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable....

15 U.S.C. § 2802(b)(2)(C).

In section 2802, Congress provided an illustrative but non-exclusive list of events deemed to be relevant to the franchise relationship and as a result of which termination is reasonable within the meaning of section 2802(b)(2)(C). If an event falls within the list, termination is conclusively presumed to be reasonable as a matter of law. *Russo v. Texaco,* 808 F.2d 221, 225 (2nd Cir.1986). The illustration that Wallace relies upon is set forth in section 2802(c)(4):

> (4) loss of the franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease, if the franchisee was notified in writing, prior to the commencement of the term of the then existing franchise—
>
> (A) of the duration of the underlying lease, and
>
> (B) of the fact that such underlying lease might expire and not be renewed

during the term of such franchise (in the case of termination) or at the end of such term (in the case of non-renewal).

Defosses claims that Wallace failed to comply with section 2802(c)(4) because, prior to the commencement of the July 24, 1984 franchise term, it failed to notify him in writing of the fact that the underlying lease might expire and not be renewed. The District Court found that Desfosses had actual knowledge of the information provided by section 2802(c)(4), and held that requiring additional written notice "would be an exercise in futility as it would merely equate with an elevation of form over substance." (App. 314).

As the District Court noted, courts have held that actual notice of the particulars protected by section 2802 will suffice if failure of written notice would elevate form over substance. For example, in *Amadeo v. Mobil Oil Caribe, Inc.,* 642 F.Supp. 962, 963 (D.P.R.1986), the court held that plaintiff's actual knowledge of the existence and the likely expiration of the underlying lease satisfied the notice of termination requirements of section 2802 even though notice was not reduced to writing. *See also Brown v. Magness Co.,* 617 F.Supp. 571, 574 (D.C.Tex.1985) (PMPA does not contemplate an elevation of form over substance where plaintiff has not been deprived of actual notification); *Brown v. American Petrofina Mktg,* 555 F.Supp. 1327, 1335 (M.D.Fla.1983), *aff'd without opinion,* 733 F.2d 906 (11th Cir.1984) (court could determine whether plaintiffs were actually aware of the information under section 2802(c)(4) and whether they were prejudiced by lack of written notice) (dicta). *But see Blankenship v. Atlantic Richfield Co.,* 478 F.Supp. 1016, 1018 (D.Or.1979) (compliance with notice provisions of section 2804(a)(2) is a mandatory prequisite to non-renewal and the court has no power either to cure or to waive a notice defect); *Thompson v. Kerr–McGee Refining Corp.,* 660 F.2d 1380, 1388 (10th Cir.1981), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1716, 72 L.E.2d 137 (1982) (expressly following *Blankenship* ).

Because, as discussed below, Wallace delivered sufficient written notice to Defosses at the beginning of the franchise term, we need not address whether Desfosses's actual knowledge of the relevant facts satisfies sections 2802(b)(2) and 2802(c)(4) in the absence of any writing. We do note, however, that under the proper circumstances a court could hold that actual notice may suffice to terminate or nonrenew a franchise because of the loss of the underlying lease. Congress gave the courts the power to permit reasonable terminations and nonrenewals based on circumstances not squarely within the illustrations of section 2802(c). The legislative history of the PMPA clearly states:

> Other events satisfying the statutory standards set forth in section [2802](b)(2)(C), but not enumerated in subsection (c) of section [2802], may nevertheless serve as a ground for termination or nonrenewal under section [2802](b)(2)(C). However, the enumerated list is intended to provide a measure of Congressional intent with respect to the meaning of this statutory standard. For that reason the term "includes such events as" is utilized. Thus, a judicial determination may be made that an event, other than one enumerated in the list, or an event similar but not identical to one enumerated in the list, constitutes an event which is relevant to the franchise relationship as a result of which termination or nonrenewal is reasonable. However, events which are not enumerated in subsection (C) must be carefully scrutinized by the courts prior to a determination that the statutory standard set forth in section [2802](b)(2)(C) has been satisfied.

S.Rep. 731 at 37–38, *reprinted in* 1978 U.S.Code Cong. and Admin.News at 896.

Courts have examined the reasonableness of a franchisor's termination or nonrenewal when based on grounds not specified in the enumerated list. *Lugar v. Texaco, Inc.*, 755 F.2d 53, 58 (3rd Cir.1985). Compare *Hifai v. Shell Oil Co.*, 704 F.2d 1425, 1430 (9th Cir.1983) (franchisor acted reasonably in recovering possession of premises so that it could avoid forfeiture of the improvements) with *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1219–23 (7th Cir.1982) (nonrenewal because franchisee failed to purchase the marketing premises must be examined for materiality of real estate contract to franchise relationship, reasonableness of terms of the real estate contract, and whether the default was beyond the reasonable control of the franchisee). *Cf. Kostantas v. Exxon Co.*, 663 F.2d 605 (5th Cir.1981) (franchisee's death justified termination), *cert. denied*, 456 U.S. 1009, 102 S.Ct. 2302, 73 L.Ed.2d 1305 (1982).

Thus, this Court could determine whether it was reasonable for Wallace not to renew the franchise where Desfosses had actual knowledge of the information required by section 2802(c)(4). We do not, however, need to address this issue in order to resolve this case. The record clearly indicates that on July 24, 1984 Wallace Energy gave Desfosses documents containing the information required by section 2802(c)(4). The March 20, 1984 "Extension of Sublease" notified Desfosses of the existence and term of the underlying sublease commencing May 1, 1984 and terminating April 30, 1985. The March 20, 1983 "Indenture of Sublease" notified him that the underlying sublease might expire at the end of the term unless Wallace exercised its option to purchase the premises by notifying the owner by certified mail at least sixty days prior to the end of the lease. At trial Desfosses and his office manager both acknowledged that they had read and understood the terms of the Indenture of Sublease and the Extension of Sublease at that time. Brief of Defendant–Appellee p. 25 (citing transcript II at 25; Tr. III at 85–86). These documents thus constitute sufficient written notice under section 2802(c)(4).

Desfosses argues that not only did Wallace fail to notify him in writing that the underlying lease might expire, but "[t]o the contrary, Desfosses was promised orally, on July 24, 1984, by Wallace that his franchise would not be terminated and it would continue after April 30, 1985, if Desfosses would agree to purchase the premises from Wallace." Brief of Plaintiff–Appellant at

28. This argument assumes that section 2802(c)(4) requires a franchisor to promise or somehow assure the franchisee, prior to the commencement of the term, that the underlying lease *will not* expire. Section 2802(c)(4), however, requires no such assurance. The section allows termination if the franchisee is notified in writing "of the fact that such underlying lease *might* expire." 15 U.S.C. § 2802(c)(4)(B) (emphasis added). Not only was Desfosses aware that the underlying lease might expire from the numerous conversations with Wallace, but also from the documents handed to him on July 24, 1984. Desfosses was on notice of the relevant facts and this constituted sufficient written notification under section 2802(c)(4).

### 2. *Compliance with Section 2804.*

■ Desfosses also claims that Wallace failed to comply with the notice provisions of section 2804. The general rule under section 2804(a) is that notice of termination must be given ninety days prior to the effective date of termination. Section 2804(b)(1) provides, however, that less than ninety days notice is permitted if reasonable under the circumstances and if notice is given on the earliest date on which furnishing such notice is "reasonably practicable."

■ In holding that Wallace complied with the PMPA the District Judge implicitly found that it was reasonable for Wallace to give less than ninety days notice and that notice was furnished on the earliest date reasonably practicable. We agree. Under the circumstances of this case, it would not be reasonable to require Wallace to have furnished more.

Wallace's lease with Mutual expired on May 1, 1985. To comply with the 90 day requirement of section 2804(a), Wallace would have had to send the termination notice by February 1, 1985. Wallace did not send the letter because as part of the July 24, 1984 franchise agreement, it had agreed to exercise the option and sell the premises to Desfosses *after* he notified Wallace he had arranged the required financing and to continue supplying gasoline to the station if he so desired. (App. 304).

The trial court found that Wallace relied on Desfosses to arrange this financing and to so notify Wallace. (App. 313 fn. 14). In the 219 days following their agreement, Desfosses failed to arrange the necessary financing. By the time he notified Wallace that the financing had been arranged on March 21, 1985, Wallace's March 1st deadline to exercise the option had passed and so had the February 1st deadline for giving Desfosses 90 days notice under section 2804(a). When it became clear after March 21, 1985 that Desfosses could not continue in possession of the premises after May 1, 1985, Wallace sent the termination letter. Because Wallace had relied on Desfosses to arrange financing, it did not send such a letter before February 1, 1985. Under these circumstances it was reasonable for Wallace to furnish less than 90 days notice under section 2804(b)(1).

Desfosses argues that section 2804(b)(1)(A) does not apply to this case. In support plaintiff cites *Wisser Co. v. Mobil Oil,* 730 F.2d 54, 60 (2nd Cir.1984). *Wisser* held that a franchisee failed to raise a serious question as to the reasonableness of termination under Section 2804(b)(1)(A) where franchisor had notified franchisee of termination "effective immediately" because of franchisee's misbranding of gasoline. In determining which circumstances justify the application of section 2804(b)(1)(A), the *Wisser* court rejected as too restrictive the analysis in *Escobar v. Mobil Oil Corp.,* 522 F.Supp. 593, 600 (D.Conn.1981). *Escobar* held that section 2804(b)(1)(A) was intended to apply only to "circumstances created by an outside agency, such as condemnation of the marketing premises." *Wisser,* 730 F.2d at 60.

The *Wisser* court found evidence of broader Congressional purpose for section 2804(b)(1)(A) in the legislative history: "Legislative history and hearings ... indicate that § 2804(b)(1)(A) was added to dispense with the lengthy notice requirement where, for example, a franchisee committed serious defaults of the franchise agreement, such as misbranding." *Id.* (referring

to S.Rep. No. 120, 94th Cong., 1st Sess. 8 (1975)); Petroleum Marketing Practices: Hearing on H.R. 13000 ... and S. 323 before the Subcommittee on Energy and Power of the House Committee on Interstate and Foreign Commerce (94th Cong., 2d Sess. 334–36, 340–41 (1976)) Desfosses claims that Wallace was not entitled to raise section 2804(b)(1)(A) as a defense in this case because he did not commit any serious default of the franchise agreement or engage in wrongful conduct.

■ We decline to restrict the application of section 2804(b)(1)(A) only to serious defaults of the franchise agreement or instances of "wrongful conduct." The language of section 2804(b)(1)(A) does not contain such a restriction. Neither does the Senate report accompanying the Act. That report simply states, "Less than 90 days notice is permitted if reasonable under the circumstances." S.Rep. at No. 731 at 40, *reprinted in* 1978 U.S.Code Cong. and Admin.News at 898. Notably *Wisser* did not restrict the application of section 2804(b)(1)(A) to instances of wrongful conduct and serious default of the franchise agreement. For the reasons discussed above, we hold that under the circumstances of this case it was reasonable to provide less than 90 days notice under section 2804(b)(1)(A).

Desfosses also argues that Wallace failed to comply with section 2804(b)(1)(A) because April 16, 1985 was not the earliest date reasonably practicable for Wallace to notify him of termination even if Wallace learned from its attorney that the option had already expired on March 21, 1985. We do not agree. Wallace was entitled to a reasonable time to evaluate the need for termination of the franchise after becoming aware of the expiration of the option. Shortly after learning that the option had expired, Wallace nevertheless attempted to exercise the option. When Trust rejected the attempt as untimely, Wallace brought suit against Trust and Mutual to enforce the option on April 10, 1985. On April 16, 1985 Wallace sent the notification required by section 2804, apparently realizing that its efforts to enforce the option might be unsuccessful. Under these circumstances, it cannot be said that the statute required Wallace to notify Desfosses of termination on an earlier date.

As this Court stated in *Avramidis v. Arco Petroleum Products Co.*, 798 F.2d 12, 17 (1st Cir.1986), "The purpose of the PMPA's notice of termination requirements is to give the dealer sufficient advance warning of the impending termination so that he may make appropriate arrangements." Here the parties allowed Desfosses to continue operating the station pending outcome of litigation to enforce the option. Desfosses remained at the station for 100 days. During this time he successfully negotiated and began operating a Getty service station franchise across the traffic circle. Under the circumstances, Wallace complied with both the spirit and the letter of section 2804 when it notified Desfosses of termination.

■ Desfosses next argues that Wallace failed to comply with Section 2804(c)(3)(A) because Wallace failed to raise Desfosses's delay in securing financing and notification as a reason for termination in the termination letter. Section 2804(c)(3)(A) provides that notice must contain "a statement of intention to terminate the franchise together with the reasons therefor." In *Davy v. Murphy Oil*, 488 F.Supp. 1013, 1015 (W.D.Mich.1980) the district court stated, "[I]t is essential that the reasons for the non-renewal be specific and unambiguous, so that plaintiffs are able to determine if reasons are consistent with the [PMPA]." In *Baldauf v. Amoco Oil Co*, 553 F.Supp. 408, 416 (W.D.Mich.1981), *aff'd*, 700 F.2d 326 (6th Cir.1983), the district court stated that "the notice should direct the franchisee to the section of the statute the franchisor relies upon so that the franchisor cannot conjure up another reason for termination after the fact." Wallace's April 16, 1985 termination letter clearly met these requirements. The letter stated:

Our relationship is being terminated because of the occurrence of an event which is relevant to the relationship between us and which is a reasonable

ground for such termination, as allowed by 15 U.S.C. § 2802(b)(2)(C). Specifically, our relationship is being terminated because Wallace Energy Inc.'s (Wallace Energy) underlying leasehold of the premises leased to you is being terminated. Therefore, Wallace Energy will no longer have the right to grant possession of the premises to you, so your tenancy must be terminated.

Exhibit 4 at Tr. 25.

In any event, Desfosses's conduct in securing financing was not the basis for nonrenewal. Rather such events served only to explain why Wallace lost the right to exercise the option. The District Judge stated, "Plaintiff's dilatory action in procuring the necessary financing, combined with the dilatory action of Wallace in attempting to exercise its notice, I find to be the concurrent proximate causes of the loss of the option." (App. 313–314). The loss of the option made the termination of the franchise inevitable. Yet loss of the underlying leasehold was the reason for the termination and that is all that need be referred to in the notice of termination.

Referring to the trial court's proximate cause language, Desfosses also claims that the District Court erroneously applied tort law to the present case. Despite the District Court's unfortunate choice of language and its reference to *New England Tel. & Tel. Co. v. Reed,* 336 F.2d 90, 95 (1st Cir.1964), it is clear that the Court based its decision not on tort law but upon the PMPA and the relevant decisions. In any event, we hold that Wallace properly terminated Desfosses under the PMPA.

### III. THE DIRECTED VERDICT

■ Desfosses also claims that the District Court erred in directing a verdict for Wallace in the pendent action for deceit. In reviewing the grant of a directed verdict, this Court has followed the rule that " '(w)hen the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict,' a directed verdict is proper." *Liberty Leather Corp. v. Callum,* 653 F.2d 694, 697 (1st Cir.1981). (citations

omitted) While the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor, we have emphasized that a "scintilla of evidence is not enough to warrant submission of an issue to the jury." *Id.* "This is particularly true where ... the party seeking a directed verdict does not bear the burden of proof." *Id.*

The Supreme Court recently reaffirmed this standard in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Furthermore, in *Anderson* the Supreme Court held that the judge must consider the substantive evidentiary standards that apply to the case in determining whether plaintiff has produced sufficient evidence to warrant submission of the issue to the jury. With this rule in mind, we now turn to New Hampshire law to determine the elements of an action in deceit and the applicable evidentiary standards.

Under New Hampshire law, one who intentionally misrepresents his intention to perform an oral agreement to sell real estate to another is subject to liability for deceit. *Munson v. Raudonis,* 118 N.H. 474, 387 A.2d 1174 (1978). In *Munson* the Supreme Court of New Hampshire stated:

[A] promise to perform in the future carries with it an implied representation that the speaker has a present intent to fulfill his promise. If the speaker makes a promise and at the same time intends not to perform, this operates as a misrepresentation of the speaker's state of mind and is a proper basis for an action in deceit.

*Id.* 387 A.2d at 1176. The court noted, however, that to prevail in a deceit action, plaintiff must prove that the decedent misrepresented her state of mind at the time the promise was made. "The mere breach of a promise is not enough by itself to establish an action in deceit." *Id.* Moreover, under New Hampshire law, plaintiff must prove defendant made such a misrepresentation by clear and convincing evidence. *See Caledonia, Inc. v. Trainor,* 123 N.H. 116, 459 A.2d 613, 617–18 (1983).

In the present case, the District Court granted Wallace's motion for a directed verdict holding that the evidence, when viewed in the light most favorable to the plaintiff, showed nothing more than a failed oral promise.

Desfosses claims that he had presented sufficient evidence for the jury reasonably to infer that Wallace misrepresented its state of mind to plaintiff on July 24, 1984. Specifically, Desfosses claims that "[i]n light of Wallace's own inconsistent testimony as to whether its promise to Desfosses was absolute, conditioned upon Desfosses first obtaining financings, or subject to its decision on whether to exercise the option, and the concurrent competing dealings with Desfosses and Labrecque, the jury may have rationally found that Wallace had not formulated an actual intent to fulfill its promise to Desfosses or that Wallace was consciously indifferent as to whether it would fulfill its promise to exercise the option and in turn sell the premises to Desfosses." Brief of Plaintiff–Appellant at 21.

■ We affirm the decision of the District Court. Plaintiff's version of the facts does not support a reasonable inference that Wallace entered into the July 24, 1984 agreement with the then present intention not to perform.

In particular, LaBrecque's request that Wallace assign him the lease so that LaBrecque could exercise the option and purchase the premises himself is not probative of Wallace's lack of intent to sell the premises to Desfosses. It is true that LaBrecque requested that Wallace assign the lease to him. Yet Wallace clearly refused to assign the lease to LaBrecque. Indeed, on September 12, 1984, Wallace's attorney notified Desfosses that "there appears to be no deal which is acceptable both to the dealer at Massabesic [Desfosses] and to Wallace Energy by which the lease for the Massabesic station could be assigned to Paul LaBrecque." Exhibit 6D at Tr. 43. These negotiations simply do not establish that Wallace had an intent on July 24, 1984 not to convey the property to plaintiff.

Indeed the evidence on record establishes that on July 24, 1984 Wallace fully intend-ed to perform its promises: (1) Wallace agreed to exercise the option and convey the premises to Desfosses at no profit to Wallace; (2) Wallace refused to assign any of its rights or obligations under the lease to LaBrecque; (3) Wallace sought to enforce the option through litigation against Trust and Mutual.

It is true that Wallace attempted to exercise the option only after the expiration date. Yet, even if we accept Desfosses's assertion that Wallace's promise to exercise its option was unconditional, Desfosses at most has established that Wallace breached an oral promise to convey real estate. In short, the evidence, when viewed in its most favorable light to plaintiff, falls far short of establishing with "convincing clarity" that Wallace had no present intention of fulfilling its promises on July 24, 1984.

## IV. CONCLUSION

We conclude that the District Court correctly rendered decision for Wallace on the issue of compliance with the PMPA and correctly directed a verdict for Wallace on the deceit count. Accordingly, the judgment below is AFFIRMED.