69 F.3d 531
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
SHELL OIL COMPANY, Plaintiff, Appellant,
v.
K.E.M. SERVICE, INC., Defendant, Appellee.
 No. 95-1314.
 United States Court of Appeals, First Circuit.
 Oct. 26, 1995.
 
 George A. Nachtigall, with whom Mark A. Pogue, Marc A. Crisafulli and Edwards & Angell were on brief for appellant.
 Paul J. Pisano, with whom Paul J. Pisano Law Associates, Albert R. Romano and Romano, Spinella & Hayes were on brief for appellee.
 Before CYR, BOUDIN and LYNCH, Circuit Judges.
 PER CURIAM.
 
 
 1
 Shell Oil Company ("Shell") sued, under the Petroleum Marketing Practices Act, 15 U.S.C. Secs. 2801 et seq. ("PMPA"), to terminate its franchise agreement and lease with K.E.M. Service, Inc. ("K.E.M.") due to alleged contract violations. K.E.M. counterclaimed, and Shell now appeals a preliminary injunction requiring it to continue selling gasoline to K.E.M. pending final adjudication of Shell's PMPA-based claims. See Shell Oil Co. v. K.E.M. Serv., Inc., No. 95-001B (D.R.I. Feb. 16, 1995). As the record does not enable a determination that the district court manifestly abused its discretion in finding that "there exist sufficiently serious questions going to the merits [of Shell's claims and K.E.M.'s defenses] to make such questions a fair ground for litigation," 15 U.S.C. Sec. 2805(b)(A), we affirm.
 
 
 2
 We state the material facts briefly. K.E.M. and its president/owner, John Gorter, operate a Shell retail gasoline station in East Greenwich, Rhode Island. Their current five-year franchise and lease agreement (hereinafter: "Agreement") expires in 1998. According to K.E.M., Shell decided in 1993 to install another franchisee on the leased premises, and when Gorter declined a buy-out offer, Shell initiated a bad-faith effort to oust K.E.M. prematurely from its franchise/lease. To this end, Shell audited and cited K.E.M. for violations of Rhode Island environmental regulations, specifically for its failure to keep a written record of daily gasoline inventory reconciliations on the leased premises. Further, Shell abruptly altered its longstanding policy of delivering "short loads" ---- i.e., less than full tank-truck loads of gasoline ---- to K.E.M. Since K.E.M. has limited underground storage-tank capacity, it was forced to buy and sell non-Shell gasoline in short loads, or else cease operation.
 
 
 3
 Shell contends that its alleged bad faith is irrelevant under the PMPA, given that K.E.M. admittedly engaged in the "willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations." 15 U.S.C. Sec. 2802(c)(10); see Agreement Art. 18.1(c)(10) (same). Shell also argues that, in at least two respects, K.E.M. "knowing[ly] fail[ed] ... to comply with ... State ... [environmental] laws or regulations relevant to the operation of the marketing premises," 15 U.S.C. Sec. 2802(c)(11); Agreement Art. 18.1(c)(11) (same). First, although K.E.M. kept gasoline inventory figures and performed a daily inventory reconciliation, it failed to record the final amount of any differential in its written records. See Rhode Island Dep't of Envtl. Management Regulation DEM-DWM-UST04-93, Secs. 13.00 et seq. (1993). Second, K.E.M.'s records were in the possession of its accountant, rather than at the service station. Shell cites case law to the effect that a franchisor's unilateral termination of a franchise is conclusively presumed "reasonable," as a matter of law and regardless whether the motives for the termination are unfairly coercive or sinister, if the franchisee has committed any of the twelve acts enumerated in PMPA Sec. 2805(c). See, e.g., Russo v. Texaco, 808 F.2d 221, 225 (2d Cir.1986).
 
 
 4
 K.E.M. counters that PMPA Sec. 2802(c) contemplates two types of equitable exceptions to the presumption prescribed in Sec. 2805(c). First, any purported PMPA recordkeeping violation was merely "technical," since K.E.M. substantially complied with Rhode Island environmental regulations. Second, Shell pressured K.E.M. into violating the PMPA ban on gasoline misbranding by preying on its hand-to-mouth fiscal condition when it abruptly changed its longstanding course of dealing regarding deliveries of "short loads." K.E.M. contends that it faced an irresoluble dilemma: either buy non-Shell gasoline for resale, or cease its retail operation for more than seven days, thereby committing a separate violation constituting an independent ground for franchise termination. See 15 U.S.C. Sec. 2802(c)(9).
 
 
 5
 An appellant challenging a preliminary injunction must bear the "heavy burden" of showing that the district court committed a mistake of law or a manifest abuse of discretion. Gately v. Commonwealth of Mass., 2 F.3d 1221, 1225 (1st Cir.1993), cert. denied, 114 S.Ct. 1832 (1994); see 28 U.S.C. Sec. 1292(a)(1). Due deference must be accorded the ruling below, since the district court is "steeped in the nuances of a case and mindful of the texture and scent of the evidence." K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir.1989).
 
 
 6
 Under the PMPA, preliminary injunctive relief is more readily available to franchisees than was the case at common law. See, e.g., Narragansett Indian Tribe v. Guilbert, 934 F.3d 4, 5 (1st Cir.1991) (describing four-part, common law standard); but cf. Nassau Boulevard Shell Serv. Station, Inc. v. Shell Oil Co., 875 F.2d 359, 364 (2d Cir.1989) (noting that PMPA franchisor must meet traditional, four-part test for preliminary injunction). Because the PMPA is a remedial statute, see infra, a franchisee need not demonstrate a likelihood of success on the merits, but merely that the franchisor terminated the franchise and that "there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation." 15 U.S.C. Sec. 2805(b)(1)(A) (emphasis added). See, e.g., Doebereiner v. Sohio Oil Co., 880 F.2d 329, 332 (11th Cir.1989), modified on other grounds, 893 F.2d 1275 (1990); Sun Ref. & Mktg. Co. v. Rago, 741 F.2d 670, 673 (3d Cir.1984).[1]
 
 
 7
 Based on a careful evaluation of the record below, we cannot conclude that the district court either committed a mistake of law or abused its discretion in ruling that K.E.M.'s proposed defenses were "sufficiently serious" to constitute "fair ground[s] for litigation." Contrary to Shell's contention, the question whether the PMPA admits of "equitable" exceptions which would excuse a franchisee's noncompliance with state environmental regulations or its gasoline misbranding are matters of first impression in this circuit, upon which we express no opinion at this juncture.[2]
 
 
 8
 Proper resolution of these important matters ---- if necessary ---- requires a more thorough exposition of the course of dealing between the parties during their nine-year franchise relationship. For example, section 2805(c)(11) proscribes a franchisee's "knowing failure " to comply with state law. Section 2801(13), however, defines "failure" to exclude "any failure which is only technical or unimportant to the franchise relationship." 15 U.S.C. Sec. 2801(13)(A). Although Shell contends that K.E.M.'s violation was not "technical," it adduced no evidence that it had ever threatened to terminate or terminated other franchisees for comparable regulatory noncompliance, nor that the State of Rhode Island had ever cited or fined a service station owner for these types of violations. See S.Rep. No. 95-731, 95th Cong., 2d Sess. 15, reprinted in 1978 U.S.C.C.A.N. 873, 874 (noting that Congress designed the PMPA with the general purpose to protect "franchisees from arbitrary and discriminatory terminations or non-renewals of their franchises") (emphasis added). At this juncture, we conclude that K.E.M.'s alleged lapses are at least arguably de minimis. Since K.E.M. does possess the raw gasoline inventory data ---- in written form ---- with which State auditors could test its daily inventory reconciliations, we can discern no manifest abuse of discretion in the district court ruling that the "technicality" of this asserted ground for termination presented K.E.M. with a colorable defense, i.e., a "fair ground for litigation." See Shell Oil Co., No. 95-001B, slip op. at 13 (D.R.I. Feb. 16, 1995).
 
 
 9
 Similarly, "Congress enacted PMPA to avert the detrimental effects on the nationwide gasoline distribution system caused by the unequal bargaining power enjoyed by large oil conglomerates over their service-station franchisees." Four Corners Serv. Station, Inc. v. Mobil Oil Corp., 51 F.3d 306, 310 (1st Cir.1995). See Desfosses v. Wallace Energy, Inc., 836 F.2d 22, 25 (1st Cir.1987) (noting that PMPA " 'must be given a liberal construction consistent with its overriding purpose to protect franchisees' ") (citing Brach v. Amoco Oil Co., 677 F.2d 1213, 1221 (7th Cir.1982)). It also left " 'to the courts the task of resorting to traditional principles of equity to maximize attainment of the competing statutory objectives consistently with ... the purposes of the [PMPA].' " Shell Oil Co. v. K.E.M. Serv., Inc., No. 95-001B, slip op. at 11 (D.R.I. Feb. 16, 1995) (quoting S.Rep. No. 95-731). Accordingly, were discovery and trial to disclose that Shell knowingly took inequitable advantage of K.E.M.'s precarious market position and inferior bargaining position, the question whether Congress contemplated "equitable" exceptions to section 2802(c)(10)'s "willful misbranding" prohibition would be presented on a fully developed factual record.
 
 
 10
 Finally, equitable relief from section 2802(10) might be considered more appropriate were K.E.M. to demonstrate at trial that Shell had breached the Agreement first, leaving K.E.M. with the Hobson's choice of buying non-Shell gasoline or going out of business. The Agreement expressly provides that Shell has no contractual obligation to deliver "short loads" to K.E.M. See Agreement Art. 9.1. On the other hand, Shell abruptly ceased providing K.E.M with "short loads" after a nine-year course of dealing. Course of dealing may be competent evidence of a subsequent modification of a written contract. See, e.g., R.I. Gen. Laws Secs. 6A-1-205, 6A-2-202. Although the Agreement contains a provision barring nonwritten modifications, see Agreement Art. 26, the PMPA specifically provides that franchise agreements may be written or oral. See 15 U.S.C. Sec. 2801(10), 2801(1)(A), (B) (defining "franchise" as "contract"); see also Royer v. Royer, 501 A.2d 739, 741 (R.I.1985) ("[A] written contract may be modified by subsequent oral agreement of the parties," even where contract expressly requires written modification only.); J. Koury Steel Erectors, Inc. v. San-Vel Concrete Corp., 387 A.2d 694, 697 (R.I.1979) (describing implied-in-fact contracts arising from course of dealing).
 
 
 11
 What is more important, the PMPA's definition of "contract" expressly provides that, "[f]or supply purposes, delivery levels during the same month of the previous year shall be prima facie evidence of an agreement to deliver such levels." 15 U.S.C. Sec. 2801(10). If the "short load" delivery levels became part of a modified Shell-K.E.M. franchise contract, Shell's abrupt change of course might constitute a breach of the franchise agreement. Thus viewed, K.E.M.'s "equitable" defense to section 2802(c)(10) might be considered at least "colorable," since K.E.M. might make a plausible argument that Congress could not have intended to permit franchisors to resort to conclusive presumptions of "reasonableness" under section 2802(c) where their own breach of the franchise agreement afforded the means of securing a per se right of termination.
 
 
 12
 Given the prominent equitable mandate in the PMPA's legislative history, as well as the nebulous and undeveloped factual record, we cannot conclude that the district court manifestly abused its discretion in deciding that "serious questions going to the merits [of Shell's claim and K.E.M.'s defenses offer] ... fair ground for litigation." Nor do we presume to determine the relative merits, either of Shell's claims or K.E.M.'s defenses.
 
 
 13
 The preliminary injunction is affirmed and the case is remanded to the district court for further proceedings.
 
 
 
 [1]
 PMPA Sec. 2805(b)(2)(B) does require the court to balance the relative hardships to the parties in granting or denying preliminary injunctive relief. Shell does not challenge this aspect of the district court ruling. See Shell Oil Co., No. 95-001B, slip op. at 15 (D.R.I. Feb. 16, 1995)
 
 
 [2]
 Our decision in Desfosses v. Wallace Energy, Inc., 836 F.2d 22 (1st Cir.1987), deals with PMPA Sec. 2802(c)(4), and not with Sec. 2802(c)(10) or (11). Although we there referred in general terms to the "conclusive presumption of reasonableness" theory set forth in Russo, supra, Desfosses had not defended on the ground that the franchisor had based its termination or nonrenewal on a purely "technical" violation of state law, nor that the franchisor's own conduct had coerced Desfosses into violating the PMPA. Indeed, Sec. 2802(c)(4) does not pertain to violative acts of the franchisee, but to acts entirely within the franchisor's control. 15 U.S.C. Sec. 2802(c)(4) (providing for termination or nonrenewal upon the "loss of the franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease, if ... the franchisee was notified in writing, prior to the commencement of the term of the then existing franchise ... of the duration of the underlying lease...."). Desfosses simply claimed that Wallace had not provided him with the requisite notice. Desfosses, 836 F.2d at 26