# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

KIMBERLY L. JACKSON,　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　　　)
　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　)　　C.A. No. 2017-0349-TMR
　　　　　　　　　　　　　　　　)
TERRY C. NOCKS,　　　　　　　 )
　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　　)


## MEMORANDUM OPINION

Date Submitted: March 30, 2018
Date Decided: April 24, 2018

Tiffany M. Shrenk, MACELREE HARVEY, LTD., Centreville, Delaware; *Attorney for Plaintiff*.

Seth L. Thompson, THE YEAGER LAW FIRM LLC, Wilmington, Delaware; *Attorney for Defendant*.


**MONTGOMERY-REEVES, Vice Chancellor.**

This dispute arises from a once romantically involved couple's shared passion for muscle cars. Plaintiff Kimberly Jackson claims that Defendant Terry Nocks agreed to purchase, restore, increase the value of, and sell a 1970 Chevelle, splitting all losses, profits, and costs 50/50. Plaintiff purchased the vehicle, paid all storage fees, and paid all restoration fees, except for $1,200 paid by Defendant. Then, once the relationship soured, rather than honoring the alleged agreement, Defendant claimed full ownership of the vehicle and tried to sell it. Plaintiff contends that the parties' agreements formed a partnership under 6 *Del. C.* § 15-202, or in the alternative, a binding oral contract. In the absence of a partnership or oral contract, she claims that she is entitled to recovery under the doctrine of promissory estoppel because Defendant made a promise to purchase and co-own the vehicle together and share in the restoration costs, and she reasonably relied on this promise to her detriment. Plaintiff appears to seek specific performance and some form of damages based on these theories. Alternatively, Plaintiff seeks money damages under unjust enrichment. For the reasons stated below, Plaintiff's request for specific performance is denied because she fails to carry her burden to show that the parties formed a valid partnership or contract, or that Defendant made an enforceable promise under promissory estoppel, but her request for money damages is granted under the doctrine of unjust enrichment.

1

## I. BACKGROUND

The facts in this opinion reflect my findings based on the parties' stipulations, twenty-four joint documentary exhibits, and the testimony of thirteen witnesses presented during a two-day trial. I grant the evidence the weight and credibility that I find it deserves.[1]

### A. The Parties Search for a Mustang

On November 17, 2014, Plaintiff and Defendant (collectively, the "Parties") met.[2] Shortly after, they became romantically involved. Plaintiff resided primarily in New Castle County, while Defendant lived in Sussex County, but they made it a point to see each other Sunday through Wednesday and communicate every day by text message or phone call.[3] As most couples do, they began to discuss future plans and endeavors. In April 2015, during a weekend spent at Plaintiff's property in Lewes, Delaware, the couple first started discussing the idea of purchasing a classic car together.[4] After watching Barrett's Auto Auction, Plaintiff told Defendant that

---

[1] Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the last name of the speaker, if not clear from the text. After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr." I intend no disrespect. Exhibits are cited as "JX #."

[2] Tr. 200 (Jackson).

[3] *Id.* at 206, 222 (Jackson).

[4] *Id.* at 204–05 (Jackson).

her passion for muscle cars started in high school when she drove a 1970 Ford Mustang.[5] Defendant assured Plaintiff he would help her find a Mustang and someone to restore it.[6]

After their initial discussion, the Parties exchanged several text messages regarding a potential Mustang purchase. Defendant asked for the year and color of Plaintiff's previous Mustang, sending corresponding pictures for comparison.[7] Plaintiff answered and responded with more pictures of Mustangs similar to the one she owned as a teenager.[8] On May 14, 2015, Defendant sent a text message saying "I'm trading the max in for a Chevelle baby!!"[9] to which Plaintiff responded, "Nooooo … We'll share the Mustang!! You'll love it just as much … I promise."[10] The next day, Defendant sent Plaintiff two pictures of a 1973 Mustang that he found "down the road from the high school."[11] Plaintiff suggested that they see that

---

[5]     *Id.*

[6]     *Id.* at 205 (Jackson).

[7]     JX 1 at 2–4.

[8]     *Id.* at 3–5.

[9]     *Id.* at 6. The "max" refers to a Maxima that Plaintiff purchased for Defendant, which he eventually traded in for a Lexus. Tr. 374–75 (Jackson), 430 (Nocks).

[10]     JX 1 at 6.

[11]     *Id.* at 8.

3

Mustang together on the weekend, and they proceeded to discuss more details about their preferences for model and trim packages.[12]

**B.      The Parties Purchase a 1970 Chevelle**

On May 17, 2015, the Parties attended the Ocean City Cruisin' Car Show to continue their search for the perfect Mustang.[13]  The Parties noticed, however, that there were more Chevelles available than Mustangs.[14]  Defendant pointed out the Chevelle surplus and assured Plaintiff that "[t]hey're a lot of fun[,]" and "if we got that . . . we could actually make money on [a Chevelle]."[15]  Plaintiff, still satisfied with the idea of purchasing a classic car, agreed.[16]  Thus, after the show, the Parties agreed to purchase the first Mustang *or* Chevelle that they could find at the best price and condition.[17]

---

[12]      *Id.* at 9.

[13]      Tr. 209 (Jackson).

[14]      *Id.* at 209–10 (Jackson).

[15]      *Id.* at 210 (Jackson).

[16]      *Id.*

[17]      *Id.* at 210–11 (Jackson).

On May 18, 2015, Defendant sent Plaintiff a picture of a Chevelle that he found on classicnation.com.[18] Plaintiff responded, "That one is perfect!!"[19] On May 29, 2015, Defendant sent Plaintiff a text message with an email address asking Plaintiff to "email this person about [the] Chevelle and ask 1. Is the price 19,000 [sic] [and] 2. How many owners."[20] The Parties continued to share and discuss options. Plaintiff sent Defendant a link on June 2, 2015, to a North Shore classic car garage, and Defendant sent Plaintiff nineteen pictures of a Chevelle that same day.[21]

In early June 2015, a friend of Defendant told him about a 1970 Chevelle (the "Chevelle" or "Car" or "Vehicle") for sale at a dealership in Georgetown, Delaware.[22] The Parties went to the shop to view the Car before making the joint decision to purchase the Chevelle.[23] On June 8, 2015, Defendant visited the dealership alone, filled out a Bill of Sale, and told the owner that he would return the next day with the funds to purchase the Car.[24]

---

[18]     JX 1 at 16.

[19]     *Id.* at 17.

[20]     *Id.* at 21.

[21]     *Id.* at 23–29.

[22]     Tr. 212–15 (Jackson).

[23]     *Id.* at 213–14 (Jackson).

[24]     *Id.* at 104–05 (Daisey); JX 7.

5

On June 9, 2015, Defendant returned to the dealership with Plaintiff to purchase the Chevelle.[25] Plaintiff brought the funds for the Car's full price and the tax, tags, title, and registration fees associated with the Chevelle purchase.[26] Shortly after their arrival, Plaintiff stepped outside the small office for relief from cigarette smoke.[27] While Plaintiff was outside, Defendant signed the Bill of Sale, provided the funds for the purchase price, and obtained a temporary tag.[28] The Parties then drove the Chevelle to Plaintiff's property in Lewes.[29] By early July 2015, Defendant moved the Car to his mother's house where it remained until the Parties initiated the restoration process in June 2016.[30] Plaintiff never drove the Vehicle because, among other reasons, Defendant was listed as the sole driver on the insurance policy.[31]

---

[25]    *Id.* at 214–15 (Jackson).

[26]    Tr. 96 (Montigny), 216 (Jackson); JX 7, 8.

[27]    Tr. 99 (Montigny), 217 (Jackson).

[28]    *Id.* at 87–88 (Montigny), 217 (Jackson).

[29]    *Id.* at 218 (Jackson).

[30]    *Id.* at 383–85 (Nocks-Hagans); JX 20 at 9–11.

[31]    Tr. 53 (Hudson), 224–25, 373–74 (Jackson); JX 6.

In late June 2015, the Parties opened a joint checking account.[32]  At no point did Defendant add any funds to the account.[33]  Although the Parties set up the account for Car expenses, such as insurance premiums and restoration costs, Defendant also withdrew funds to support his start-up trucking business as well as various personal expenses.[34]  Plaintiff was aware of all of Defendant's withdrawals, fully encouraging his business endeavors and supporting him financially.[35]

Throughout summer 2015, they exchanged several text messages informing each other about the whereabouts and condition of the Chevelle.[36]  Defendant tuned up the Car and took it for occasional joy rides.[37]  On June 16, 2015, Plaintiff texted Defendant, "Where are you going with the car babe? I'm so jealous that you're sporting around in our girl without me."[38]  The Parties exchanged suggestions for different parts and aesthetic options, including a debate over which color to paint the

---

[32]    Tr. 222 (Jackson); JX 3.

[33]    Tr. 223 (Jackson).

[34]    *Id.*  On several occasions, Defendant withdrew funds to cover his life insurance bill, cell phone bill, and his son's school fees.  JX 1 at 59, 83, 125.

[35]    *See* Tr. 223 (Jackson); JX 1 at 59, 71, 83–84, 102.

[36]    JX 1 at 46, 48, 53, 63, 65–66, 72, 85, 88.

[37]    *Id.*

[38]    *Id.* at 55.

Chevelle, blue or black.[39]  As of August 28, 2015, Defendant was the only owner listed on the title for the Chevelle.[40]  Sometime thereafter, Plaintiff saw the title and asked Defendant why her name was not listed.[41]  Defendant offered to add Plaintiff's name to the title but she declined, stating that they could retitle the Car at the time they reappraise it.[42]

## C.     The Restoration Process

In August 2015, the Parties began searching for restoration shops.[43]  The first shop they visited, Sussex County Customs, gave them a $60,000 to $100,000 estimate and a one year waiting period.[44]  In October 2015, the Parties visited Six Deuces Speed Shop, which gave a $50,000 to $70,000 estimate with a longer waiting period.[45]  They declined to use this shop as well.[46]

---

[39]    *Id.* at 38, 43, 57, 78–79.

[40]    JX 10.

[41]    Tr. 225–27 (Jackson).

[42]    *Id.* at 227 (Jackson).  Defendant denies that this conversation occurred.  *Id.* at 451 (Nocks).

[43]    *Id.* at 229–30 (Jackson).

[44]    *Id.* at 229 (Jackson).

[45]    *Id.*

[46]    *Id.*

In January 2016, the Parties broke off their relationship.[47] Plaintiff had discovered Defendant was living with another woman, Charletta McCray, and confronted McCray in the home that McCray shared with Defendant.[48] Plaintiff then confronted the mother of Defendant's child, Jade Wright, at her workplace, warning Wright about Defendant's relationships with Plaintiff and McCray.[49] A few weeks later, the Parties made up and gradually returned to the Chevelle project. They began discussing more exterior part options and re-exploring restoration shops.[50] Defendant continued his joy rides.[51] On May 28, 2016, Plaintiff responded to a picture Defendant sent of him posing in front of the Chevelle saying "I'm still happy to see you and 'our girl' in the background."[52]

In June 2016, the Parties agreed to take the Car to R&M Performance ("R&M") for restoration.[53] After a satisfactory interview with R&M, Plaintiff filled

---

[47]     *Id.* at 230 (Jackson).

[48]     *Id.* at 27 (McCray), 231–34 (Jackson).

[49]     *Id.* at 234–35 (Jackson).

[50]     *Id.* at 229, 235 (Jackson); JX 1 at 94–96.

[51]     *See* JX 1 at 93, 104.

[52]     JX 1 at 104.

[53]     Tr. 237 (Jackson).

9

out the contract, both Parties signed it, but only Plaintiff paid the $2,600 deposit.[54]

While both Parties received the invoices from R&M for the restoration costs, Plaintiff alone paid them.[55] By the end of July 2016, the Parties became dissatisfied with R&M's service.[56] By happenstance, they met with Brian Romine, an employee of R&M at the time, who told them how he believed the restoration could be improved and pointed out what he believed to be disingenuous charges on their invoice.[57] The Parties decided to remove the Car from R&M and engage Romine's solo services to perform the remaining restoration.[58] The Parties split the cost of the $2,000 deposit for Romine's services, and Defendant paid for the Car to be towed from R&M to Romine's shop.[59] Thereafter, with one exception, Plaintiff paid all of

---

[54]  *Id.* at 238–39 (Jackson); JX 13.

[55]  Tr. 240 (Jackson); JX 14.

[56]  Tr. 113 (Romine), 241–42 (Jackson).

[57]  *Id.* at 242–44 (Jackson).

[58]  *Id.* at 113 (Romine), 237, 248 (Jackson); JX 1 at 109. On July 18, 2016, Plaintiff sent Romine an email seeking his services. JX 22 at 5. In her email, she states, "We briefly met with you on July 11th to look at the progress on our vehicle . . . . Can we possibly meet with you on Monday . . . to discuss the project, get your opinion on how best to accomplish what we're looking for, and 'guesstimate' the investment you expect we'll have to get it to that point?" *Id.*

[59]  Tr. 249, 254 (Jackson).

Romine's invoices for the restoration services.[60] The Parties visited the shop once a month to monitor the progress, and Defendant visited twice on his own.[61] Both Parties actively voiced their opinions throughout the restoration process, keeping Romine's recommendations in mind when making decisions.[62] The debate over painting the Car blue or black persisted.[63] In the Parties' conversations with Romine, they mentioned the idea of selling the Car to fund Defendant's son's college tuition.[64]

In August 2016, Plaintiff's son passed away.[65] Defendant told Romine to communicate only with him while Plaintiff grieved the passing, and Romine obliged.[66] Plaintiff lamented that she could not remain actively involved in the restoration process during that time, texting Defendant, "Can we please talk tomorrow morning before you leave for [Romine's]? I'm crushed that I can't be

---

[60]    *Id.* at 135, 159–60 (Romine).

[61]    *Id.* at 120 (Romine).

[62]    *See id.* at 115, 119–20, 124–25, 128, 139, 152, 157 (Romine); JX 1 at 109, 112, 121–22.

[63]    JX 1 at 123–24, 134.

[64]    Tr. 129–30, 153–54 (Romine).

[65]    *Id.* at 377 (Jackson); JX 1 at 117.

[66]    Tr. 122 (Romine).

11

there to go with you … that's one of the things that's supposed to be 'ours.'"[67] On August 25, 2016, Defendant instructed Romine to include Plaintiff again in the restoration discussions.[68]

On January 18, 2017, Defendant discussed selling the Chevelle with his insurance agent.[69] Plaintiff was not a party to that conversation, despite previously suggesting to Defendant that they sell the Car.[70]

At the end of March 2017, after Plaintiff caught Defendant sending Prada sandals to another woman, the Parties ended their relationship, this time for good.[71] Defendant, sensing the demise of the relationship, withdrew $7,000 from the their joint checking account.[72] On April 16, 2017, Defendant sent Romine a text message instructing him not to speak with Plaintiff regarding the Chevelle.[73] Romine agreed without further context because he knew that the title to the Chevelle remained solely

---

[67]    JX 1 at 117.

[68]    JX 24 at 107.

[69]    Tr. 73–75 (Benton); JX 11 at 2.

[70]    JX 1 at 92.

[71]    Tr. 261, 263, 265 (Jackson), 471 (Nocks).

[72]    *Id.* at 263, 265 (Jackson).

[73]    *Id.* at 132, 134, 175–76 (Romine); JX 24 at 692.

in Defendant's name.[74]  Unbeknownst to Plaintiff, Defendant visited Romine at the shop, brought him a car part, and made a payment.[75]  Later that spring, restoration of the Chevelle ceased completely.[76]

On May 8, 2017, Plaintiff filed this action against Defendant seeking specific performance and damages.  Trial took place on January 24, 2018, and January 25, 2018.

## II.    ANALYSIS

Plaintiff argues that she is entitled to 50% ownership of the Chevelle based on four alternative theories.  All four theories rest on the same core allegations.  Plaintiff contends that Defendant agreed to purchase, restore, increase the value of, and sell the 1970 Chevelle, splitting all losses, profits, and costs 50/50.[77]  These agreements, she argues, form the basis of either a partnership, oral contract, or a promise enforceable by the doctrine of promissory estoppel.  Based on these claims, Plaintiff seeks specific performance and some form of damages.  Plaintiff avers that

---

[74]    Tr. 132–33 (Romine).

[75]    *See id.* at 134–35 (Romine).

[76]    *Id.* at 131–32 (Romine).

[77]    *See* Pl.'s Opening Br. 33–35.

if these arguments fail, damages should be awarded to her under the doctrine of unjust enrichment.

## A. The Parties Did Not Form a Partnership Under 6 *Del. C.* § 15-202

In Delaware, a partnership is formed through "the association of 2 or more persons (i) to carry on as co-owners a business for profit . . . whether or not the persons intend to form a partnership . . . ."[78] Although whether the parties intended to be classified as partners is not determinative of whether a partnership was formed, "[t]he creation of a partnership is [still] a question of intent."[79] Thus, "the question is whether or not the partners have intended to enter into a relationship . . . the essence of which is partnership."[80] "It is important to note that '[w]here the suit is between the parties as partners, stricter proof is required of the existence of a partnership than where the action is by a third person against either actual partners or persons sought to be charged as partners.'"[81] "[T]here is no singularly dispositive consideration that determines whether or not a partnership existed between two

---

[78]    6 *Del. C.* § 15-202(a).

[79]    *Hynansky v. Vietri*, 2003 WL 21976031, at *5–6 (Del. Ch. Aug. 7, 2003) ("[T]he fundamental inquiry in determining whether the parties created a general partnership is the intention of those parties.").

[80]    *Ramone v. Lang*, 2006 WL 905347, at *12 n.50 (Del. Ch. Apr. 3, 2006) (citing RUPA § 15-202 (2005) (Author's Comments)).

[81]    *Id.* at *12 (quoting *Ellison v. Stuart*, 43 A. 836, 838 (Del. Super. Ct. 1899)).

parties."[82]  "To conclude that a partnership existed, though, a court must find that there was 'a common obligation to share losses as well as profits.'"[83]  A court may consider the "'acts, the dealings and conduct of the parties, and admissions of the parties' to establish that a partnership existed."[84]  A written agreement is not conclusive but is strong proof of an existing partnership.[85]  If no written agreement exists, the Court determines whether an enforceable agreement was formed "solely on the credibility of the parties."[86]

Plaintiff contends that the Parties formed a partnership under 6 *Del. C.* § 15-202 to carry on as co-owners of a business for profit.  She asserts that their business involved purchasing, restoring, increasing the value of, and selling the 1970 Chevelle, splitting all losses and profits equally.[87]  Plaintiff argues that Defendant breached his fiduciary duties when he improperly asserted himself as the sole owner

---

[82]     *Id.*

[83]     *Id.* (quoting *Acierno v. Branmar*, 1976 WL 3, at *4 (Del. Ch. Feb. 19, 1976)).

[84]     *Id.* (quoting *In re Estate of Fenimore*, 1999 WL 959204, at *5 (Del Ch. Oct. 8, 1999)).

[85]     *See id.*; *see also Hynansky*, 2003 WL 21976031, at *6.

[86]     *See Godsell Mgmt., Inc. v. Turner Promotions, Inc.*, 2007 WL 4226667, at *3 (Del. Ch. Nov. 28, 2007).

[87]     Pl.'s Opening Br. 31, 33, 36.

of the Chevelle and interfered with Plaintiff's partnership rights.[88]  Based on this claim, Plaintiff seeks specific performance to fulfill the alleged terms of the agreement, as well as some form of damages.[89]  Because there is no written agreement, I base my decisions solely on the credibility of the Parties.[90]

Plaintiff's partnership claim fails because she did not show that the Parties agreed to a "common obligation to share losses as well as profits."[91]  The Parties were involved in a long distance relationship.  As a result, their relationship is documented in many text messages and emails.  In fact, over 150 pages of their text messages and thirty-one pages of their emails relate specifically to the Chevelle.

---

[88]     *Id.* at 39.

[89]     *Id.* at 39–40.

[90]     The Court has reason to doubt both Parties' credibility.  Plaintiff, for example, was not honest with the Court about where the Chevelle was stored from June 2015 to May 2016, when the Parties took it to R&M for restoration.  She testified that the Vehicle remained at her property in Lewes, with the exception of some holidays, but vast amounts of evidence exists—including picture documentation—that proves that the Vehicle remained at Defendant's mother's house from July 2015 to May 2016.  *Compare* Tr. 236–37 (Jackson), *with* Tr. 382–86 (Nocks-Hagans), JX 1 at 48, 50, 72–73, 77, 91, *and* JX 20 at 3–11, 14–16, 18–21, 23–26.  On the other hand, it is also clear that Defendant conducts himself in a less than forthright manner. A few examples include lying to his mother about how he obtained the Chevelle, hiding his long-term relationship with McCray from Plaintiff, and hiding his relationship with Plaintiff from McCray.  Tr. 382 (Nocks-Hagans), 470, 472 (Nocks).

[91]     *Ramone*, 2006 WL 905347, at *12.

16

But, this evidence, as well as twenty-two other documents, are completely bereft of a conversation, much less agreement, between the Parties to share in potential losses. Similarly, none of the text messages, emails, or other documents provided in this litigation, and there are many, reflect an agreement of the Parties to split profits 50/50 as Plaintiff now claims. If anything, the evidence suggests that the Parties had an idea for the proceeds of a potential sale to go to Defendant's son's (J.W.) college education. For example, on August 3, 2015, Plaintiff texted Defendant, "Babe … we better be able to get a TON of money when we sell the Chevelle … the kids are telling me that college is about $50,000 a year now … so [J.W.'s] education is going to cost upwards of $200,000!!!"[92] Plaintiff's contemporaneous words, which suggest a potential plan to use the funds to cover Defendant's son's college education, contradict her litigation position that the Parties intended to "share any profits 50/50."[93] Further, Romine's testimony at trial confirms that the Parties mentioned using the money for J.W.'s education in his presence.[94] Similarly, Defendant testified that it was a "broad dream" for the Parties to use the funds for

---

[92]     JX 1 at 86.

[93]     Pl.'s Opening Br. 33.

[94]     Tr. 129–30, 153–54 (Romine).

J.W.'s education.[95]   Based on Plaintiff's pre-litigation statements and testimony

from an unrelated third-party, I find that the Parties did not agree to share in the

profits as Plaintiff suggests.  Because there was never "a common obligation to share

losses as well as profits,"[96] Plaintiff's partnership claim must fail.

## B. The Parties Did Not Create an Enforceable Contract

In Delaware, "a valid contract exists when (1) the parties intended that the

contract would bind them, (2) the terms of the contract are sufficiently definite, and

(3) the parties exchange legal consideration."[97]   An enforceable contract must

contain all material terms, and the acceptance must be identical to the offer.[98]  "Overt

manifestations of assent rather than subjective intent control contract formation."[99]

In determining whether an "overt manifestation of assent" occurred, the Court

considers whether a reasonable person would "conclude that the parties intended to

be bound" by examining the assent as well as the surrounding circumstances.[100]

---

[95]    *Id.* at 483 (Nocks).

[96]    *Ramone*, 2006 WL 905347, at *12.

[97]    *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010) (citing *Carlson v. Hallinan*, 925 A.2d 506, 524 (Del. Ch. 2006)).

[98]    *Ramone*, 2006 WL 905347, at *10.

[99]    *Id.*; *see Shah v. Shah*, 1988 WL 81159, at *868 (Del. Ch. Aug. 3, 1988).

[100]   *Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1101 (Del. Ch. 1986).

Valid acceptance has three general components: (1) "an expression of commitment;" (2) "the commitment must not be conditional on any further act by either party;" and (3) "the commitment must be one on the terms proposed by the offer without the slightest variation."[101] A contract is formed "when all of the terms that the parties themselves regard as important have been negotiated."[102] In a claim for specific performance, "all essential terms of the agreement must be sufficiently definite to establish an enforceable contract."[103]

Plaintiff argues that, even if the Court finds no valid partnership, the Parties agreement to act as co-owners is still enforceable under contract law.[104] Plaintiff asserts that the contract contains the following material terms: (1) to co-own, restore, show, and eventually sell the Car; (2) split profits 50/50; and (3) split costs associated with the purchase and renovation 50/50.[105] Plaintiff argues that Defendant's breach of their oral contract entitles her to specific performance.[106]

---

[101]    *Ramone*, 2006 WL 905347, at *11.

[102]    *Leeds*, 521 A.2d at 1101–02.

[103]    *Pulieri v. Boardwalk Props., LLC*, 2015 WL 691449, at *6 (Del. Ch. Feb. 18, 2015).

[104]    Pl.'s Opening Br. 36.

[105]    *Id.* at 36–37.

[106]    *Id.* at 40, 44.

19

Plaintiff's contract claim fails because she does not show that the Parties agreed to two material terms of their alleged oral contract. First, as discussed above, Plaintiff fails to point to any contemporaneous evidence that suggests that the Parties agreed to split profits in any manner, let alone equally. Second, the evidence does not suggest that the Parties agreed to split the purchase, restoration, and other costs 50/50. Out of all of the expenses paid toward the restoration of the Chevelle— totaling approximately $24,390[107]—the evidence reflects just one occasion where the Parties split a cost equally, with Defendant contributing a mere $1,000 plus a $200 towing fee.[108] Otherwise, Plaintiff bore all other costs associated with the purchase, restoration, and maintenance of the Chevelle.[109] Plaintiff fails to identify a single piece of contemporaneous evidence that reflects any negotiation, let alone any agreement, to these terms. Therefore, I find that the Parties did not create an enforceable contract under Delaware law.

---

[107] The Parties agreed at the time of trial that the total amount of expenditures is $66,890.47. Pl.'s Opening Br. 43–44; Pl.'s Reply Br. 16. After subtracting the purchase price and the storage fees, the restoration expenses total $24,390.47. Pl.'s Opening Br. 43–44.

[108] Tr. 298 (Jackson).

[109] The Parties agreed to open a joint checking account to cover expenses for the Vehicle. Tr. 221 (Jackson). When asked whether Defendant contributed any funds to this account, Plaintiff responded, "Not a dime." *Id.* at 223 (Jackson). Defendant did not contradict this testimony.

20

Plaintiff relies heavily on *Elliott v. Jones*[110] to support her argument that the Parties formed a valid agreement.[111] That case involved a claim for specific performance to execute an agreement to purchase a race horse.[112] The plaintiff argued that the defendant breached their agreement to share profits and expenses equally when the defendant refused to accept the plaintiff's share of the purchase price.[113] Thereafter, the defendant denied the agreement set forth in their contract.[114] This Court held that the "testimony at the trial showed that the contract was made as claimed by the [plaintiff], and not as alleged by the defendant[,]" to split the purchase and expenses for the bay mare.[115] This case is distinguishable. Plaintiff argues that the "terms of the parties' agreement in *Elliott* are similar to those to the Parties in this case."[116] While the facts do render some parallels, Plaintiff fails to prove that the Parties had an enforceable contract. Here, Plaintiff contends that the contract agreement consisted of three essential terms: (1) to co-own, restore, show, and

---

[110]    101 A. 874 (Del. Ch. 1917).

[111]    Pl.'s Opening Br. 34–35, 41.

[112]    *Elliott*, 101 A. at 874.

[113]    *Id.*

[114]    *Id.*

[115]    *Id.*

[116]    Pl.'s Opening Br. 35.

eventually sell the Car; (2) to split profits 50/50; and (3) to split costs 50/50. But for the reasons stated above, Plaintiff fails to show, unlike the plaintiff in *Elliott*, that the Parties actually agreed to two of the terms that she deemed essential to the oral contract. Therefore, Plaintiff has no basis for recovery under a breach of contract theory.

## C. Plaintiff's Promissory Estoppel Claim Fails

To state a claim for promissory estoppel, Plaintiff must prove by clear and convincing evidence that "(i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise."[117]

Plaintiff argues that to the extent that the Court does not find an enforceable partnership or oral contract, Plaintiff is still entitled to specific performance and some form of damages under the doctrine of promissory estoppel.[118] She asserts that Defendant made a promise to purchase and co-own the Vehicle together and share in the restoration costs. For the same reasons stated above, Plaintiff did not point to

---

[117] *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000).

[118] Pl.'s Opening Br. 37.

any convincing evidence that Defendant made a promise to Plaintiff to share in the restoration costs. Thus, Plaintiff has not proven that Defendant made this promise by clear and convincing evidence.

Even assuming Plaintiff could prove Defendant made a valid promise as asserted, I am not convinced that Plaintiff reasonably relied on receiving repayment for the purchase or restoration costs of the Chevelle. By her own admission, Plaintiff was well aware of Defendant's financial restrictions.[119] She financed several of Defendant's other expenses unrelated to the Chevelle, including his attorneys' fees in a separate discrimination lawsuit, gifts for his son and his parents, trucks and weekly expenses for his trucking business, an iPhone, expenses for his 40th birthday party including paying for the musician, lavish trips, tickets to sporting events, an appliance for his mother's home, his monthly bills, and a $200 "weekly allowance."[120] The evidence suggests that Defendant never agreed, nor did Plaintiff reasonably believe, that he would contribute equally to costs associated with the Chevelle. Therefore, Plaintiff's request for specific performance and damages under promissory estoppel is denied.

---

[119]   Tr. 239–41 (Jackson).

[120]   *Id.* at 223, 262, 275, 313, 360 (Jackson), 425, 430, 460–61, 551–52 (Nocks); JX 1 at 58–59, 125, 136.

**D. Plaintiff is Entitled to Recovery Under Unjust Enrichment**

Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[121] To state a claim for unjust enrichment, Plaintiff must prove "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[122] "A claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim."[123]

In the absence of an enforceable partnership, contract, or promise, Plaintiff argues that she lacks an adequate remedy at law and should recover under the doctrine of unjust enrichment.[124] She asserts that Defendant has been unjustly enriched, causing her impoverishment, in two ways.[125] First, Plaintiff purchased the Chevelle, but it is titled in Defendant's name only. Second, Plaintiff's financial

---

[121] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)).

[122] *Id.*

[123] *Kuroda v. SPJS Holding, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009).

[124] Pl.'s Opening Br. 43.

[125] *Id.* at 42.

24

contributions have doubled the value of the Chevelle since its purchase. Plaintiff avers that as a result of this enrichment at her expense, she is entitled to money damages totaling $66,890.47.[126]

Defendant concedes that the first three elements are met, but he contests the fourth element.[127] Specifically, Defendant argues that his enrichment and Plaintiff's impoverishment is justified because she gave the Chevelle as a gift. A gift requires: (1) donative intent on behalf of the donor; (2) the donee to have received the gifted property; and (3) the donor to have relinquished the right to present and future control over the gifted property.[128]

To prove donative intent, Defendant argues that the Parties were in a romantic relationship in which Plaintiff gave Defendant multiple expensive gifts, including vehicles.[129] But the mere fact that Plaintiff previously gave generous gifts, even if the gifts are similar in value and type, does not prove that the Chevelle was also a gift. In fact, Plaintiff's pattern as it relates to gifts to Defendant does not mirror how

---

[126]     *Id.* at 43.

[127]     Def.'s Answering Br. 38. Defendant does not mention the fifth element in his brief. Arguments not briefed are deemed waived. *Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) (citing *Murphy v. State*, 632 A.2d 1150, 1152 (Del. 1993)).

[128]     *Cartanza v. Cartanza*, 2002 WL 31007802, at *3 (Del. Ch. Aug. 8, 2002) (citing *Danvir Corp. v. Wahl*, 1987 WL 16507, at *6 (Del. Ch. Sept. 8, 1987)).

[129]     *See* Def.'s Answering Br. 38.

she treated the Chevelle. Plaintiff readily admits she gave Defendant a Maxima—which he eventually traded for a Lexus—a motorcycle, several watches, clothes, and lavish trips.[130] But, Plaintiff argues, and I agree, that there are distinct differences between these gifts and the Chevelle. First, Plaintiff did not assert her opinion on the purchase, care, storage, color, or other specifics of the Maxima, Lexus, or motorcycle. But Plaintiff asserted her opinions about the Chevelle endeavor from which classic car to purchase—a Mustang or a Chevelle—to which color to paint the Chevelle—blue or black.[131]

Second, the Parties never described gifted vehicles as "ours" or made any joint plans regarding those vehicles. By contrast, on June 16, 2015, one week after the Parties purchased the Chevelle, Plaintiff texted Defendant, "Where are you going with the car babe? I'm so jealous that you're sporting around in *our girl* without me."[132] On May 28, 2016, in response to a picture Defendant sent of himself in front of the Chevelle, Plaintiff texted, "I'm still happy to see you and '*our girl*' in the background."[133] On July 11, 2016, in an email soliciting Romine's services to take

---

[130]   *See* Tr. 268 (Jackson).

[131]   *See id.* at 210 (Jackson); JX 38, 43, 57, 78–79.

[132]   JX 1 at 55 (emphasis added).

[133]   *Id.* at 104 (emphasis added).

26

over the restoration, Plaintiff's opening line reads: "We briefly met with you on July 11th to look at the progress on *our vehicle*."[134] On August 14, 2016, right after Plaintiff's son passed, she texted Defendant, "Can we please talk tomorrow morning before you leave for [Romine's]? I'm crushed that I can't be there to go with you … that's one of the things that's supposed to be '*ours*.'"[135] On September 7, 2016, Plaintiff emailed Defendant, "And as far as the car … that's *our* dream baby, and has been since the first day we drove off of the lot with her! . . . . It's something fun for us to share, look forward to, get excited . . . and fantasize about."[136] At trial, Defendant testified that the "our" language was used "[o]ut of courtesy" "[b]ecause we [were] in a relationship."[137] But he also testified that he and Plaintiff had discussed how restoring the Chevelle was something for them to do as a couple.[138]

Third and finally, Plaintiff did not assert any ownership rights to any of the uncontested gifts either during or after their relationship ended.[139] As to the

---

[134] JX 22 at 5 (emphasis added).

[135] JX 1 at 117 (emphasis added).

[136] JX 19 at 17 (emphasis added).

[137] Tr. 517–18 (Nocks).

[138] *See id.* at 437 (Nocks).

[139] Pl.'s Reply Br. 6.

27

Chevelle, the evidence suggests that throughout their relationship, Plaintiff maintained that she and Defendant co-owned the Vehicle and would enjoy it together.[140]

Defendant points to text messages where Defendant expressed gratitude to Plaintiff for the Chevelle as further evidence of donative intent.[141]  Specifically, in response to Defendant's text message: "[you're] the best . . . thank you Kimmy[,]" Plaintiff wrote, "For more reasons than just a 'big block'[142] I hope!!"[143]  That same day, Defendant texted Plaintiff details about the Chevelle's interior, and Plaintiff replied, "You need a bigger damn 'toy box' . . . Lol. The collection just keeps growing!"[144]  But, I am not convinced that these text messages alone prove donative intent.[145]  It is reasonable that Defendant was grateful for Plaintiff's willingness to fund the project when he did not have the financial means to purchase and restore a

---

[140] *See* Tr. 228 (Jackson); Pl.'s Opening Br. 41; Pl.'s Reply Br. 11, 15.

[141] *See* Def.'s Answering Br. 31–32.

[142] Defendant testified at trial that the Parties referred to the Chevelle as the "big block." Tr. 495 (Nocks).

[143] JX 1 at 30.

[144] *Id.* at 34–35.

[145] McCray and Wright testified at trial that Plaintiff told them that she purchased the Chevelle as a gift for Defendant.  Tr. 37 (McCray), 379 (Wright).  Plaintiff denies these statements.  Pl.'s Reply Br. 3. Their testimonies are not convincing and fail to rebut all of the contemporaneous writings and conversations between the Parties.

classic car on his own. Thus, the preponderance of the evidence establishes that Plaintiff did not intend to gift the Chevelle to Defendant. Because the first element of a gift is not met, I need not reach the second and third elements.

Finding for Plaintiff on the basis of unjust enrichment is the equitable remedy here. Although the Parties do not legally co-own the Vehicle, substantial evidence suggests that both Parties intended to enjoy this Vehicle together. In particular, the Parties exchanged several text messages that demonstrate they both actively engaged in the decision-making process of which car to purchase.[146] Defendant texted Plaintiff pictures of Mustangs for sale to see if they matched her first Mustang.[147] Plaintiff responded with pictures of her own.[148] But when they visited the Ocean City Cruisin' Car Show and noticed the scarcity of Mustangs, they shifted their search to include Chevelles.[149] Correspondingly, their text messages started to include pictures and links of Chevelles for sale.[150] When a Chevelle became

---

[146] *See, e.g.*, JX 1 at 2–9.

[147] *Id.* at 2–4.

[148] *Id.* at 3–5.

[149] Tr. 208–10 (Jackson).

[150] JX 1 at 16, 22–29.

available, they mutually agreed to forgo the beloved Mustang and purchase the Chevelle.[151]

The Parties also collaborated in the restoration process. They visited three restoration shops together before jointly agreeing on one.[152] When the work of R&M became unsatisfactory, the Parties decided to contract Romine's services.[153] Unless instructed otherwise by Defendant, Romine discussed the progress of the restoration with both Parties.[154] Romine testified at trial that he had a close relationship with both Plaintiff and Defendant, that all three of them discussed taking the Chevelle to different car shows, and that both Parties provided comments on which exterior designs to implement and parts to order.[155] In several instances, Defendant forwarded text messages from Romine to Plaintiff to ensure her involvement in the decision-making process.[156] Likewise, Plaintiff forwarded text messages and emails she received from Romine to Defendant regarding the Chevelle restoration.[157]

---

[151]    Tr. 213–14 (Jackson).

[152]    *Id.* at 229, 237 (Jackson).

[153]    *Id.* at 242–44 (Jackson); JX 22 at 5.

[154]    *See id.* at 115, 119–20, 124–25, 128, 139, 152, 157 (Romine); JX 24 at 107, 692.

[155]    Tr. 115–20, 126–27, 152 (Romine); JX 1 at 95.

[156]    JX 1 at 112–13, 121–22, 126–27, 130–32.

[157]    *Id.* at 109.

Romine also testified that "[t]hey wanted to have a car that they could enjoy together and drive and cherish the moments, et cetera, et cetera."[158] Similarly, both Plaintiff and Defendant testified that it was their dream to show the Vehicle at renowned car shows.[159]

In sum, all of this evidence suggests that while the Parties did not legally co-own the Vehicle, they did preserve the initial intention to make joint decisions regarding the purchase and restoration of the Vehicle and enjoy it together as a couple. Although Plaintiff did not show that the Parties formed a valid partnership or enforceable contract, or that Defendant made a promise enforceable by promissory estoppel, she did show that Defendant was unjustly enriched to her detriment. Therefore, she is entitled to all expenditures on the Chevelle, including the storage fees incurred during the pendency of this action.

## III. CONCLUSION

For the foregoing reasons, neither a partnership nor a contract existed between the Parties, and Plaintiff failed to carry her burden of proving promissory estoppel. Plaintiff, however, has shown that Defendant was unjustly enriched. Therefore, she

---

[158]     Tr. 126 (Romine).

[159]     *Id.* at 364 (Jackson), 527 (Nocks).

is entitled to damages in full.  The Parties shall submit a joint form of order within five days of this opinion.

**IT IS SO ORDERED.**