# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SHAREHOLDER REPRESENTATIVE SERVICES LLC, solely in its capacity as Representative of the former stockholders of ADVANTAGE HEALTHCARE HOLDINGS, INC., | ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | C.A. No. 2022-0166-PAF |
| HPI HOLDINGS, LLC, | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: January 9, 2023
Date Decided: April 26, 2023

Richard L. Renck, Michael B. Gonen, DUANE MORRIS, LLP, Wilmington, Delaware; Michael P. Gallagher, DUANE MORRIS, LLP, Philadelphia, Pennsylvania; *Attorneys for Plaintiff Shareholder Representative Services LLC*.

Lisa A. Schmidt, Matthew W. Murphy, Nicole M. Henry, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; David P. Whittlesey, Jacob Fields, SHEARMAN & STERLING LLP, Austin, Texas; *Attorneys for Defendant HPI Holdings, LLC*.

**FIORAVANTI, Vice Chancellor**

This is a breach of contract case involving a dispute over whether the purchaser of a business must make post-closing payments to the selling stockholders. This opinion addresses one aspect of the dispute—whether the selling stockholders are entitled to a $6 million earn-out payment. That payment is conditioned upon the surviving company entering into an agreement to make up for the potential loss of one of its major customers. The surviving company entered into an agreement that maintained the relationship with that customer. Thereafter, the selling stockholders demanded payment of the earn-out. The buyer refused, contending that the agreement did not meet the specific criteria necessary to trigger the earn-out payment. Plaintiff, representing the former stockholders of the seller, has alleged that the buyer's refusal to pay the earn-out is a breach of the purchase agreement. The buyer has moved to dismiss that claim. Applying well-established canons of contract construction, the court concludes that the language of the earn-out provision is not ambiguous and that the buyer's motion must be granted.

## I.    BACKGROUND

Unless otherwise specified, the facts recited in this Memorandum Opinion are drawn from the Verified Amended Complaint (the "Complaint") and documents integral thereto.[1]

### A.    The Parties

On September 30, 2021, HPI Holdings, LLC ("HPI" or "Defendant") entered into a merger agreement (the "Merger Agreement")[2] to acquire AdvantEdge Healthcare Holdings, Inc. (the "Company"), a Delaware corporation engaged in the medical billing business.  The Company was the surviving entity in a merger with a wholly owned subsidiary of HPI.  Among the Company's operating subsidiaries is AdvantEdge Healthcare Solutions, Inc. ("AHS").[3]    Plaintiff, Shareholder Representative Services LLC ("Plaintiff"), is a party to the Merger Agreement and is the representative of the former stockholders of the Company, each of whom sold their shares of the Company to HPI in the transaction.[4]

---

[1] Dkt. 15 ("Compl.").  The Complaint incorporates by reference exhibits attached to the first-filed complaint.  Dkt. 1.  These exhibits will be cited as "Ex."  References to the parties' briefs refer to the briefs filed in support of or opposition to the motion to dismiss the Complaint.  *See* Dkts. 23, 27, 30.

[2] Ex. A ("Merger Agreement").

[3] The Complaint alleges that the Company did business as AdvantEdge Healthcare Solutions or "AHS."  Compl. at 1.

[4] Merger Agreement § 10.1.

During the merger negotiations, one of AHS's customers, Brevard Physician Associates ("BPA"), notified AHS that BPA intended to terminate its "Service Agreement" with AHS.[5]  The Service Agreement contained a provision that permitted termination for convenience after a 90-day notice period, or a 180-day period for the anesthesia division.[6]

Following the consummation of the merger, $375,000 was deposited into an escrow account for adjustments to the purchase price resulting from a post-closing computation of working capital.  Another $16,800,000 was placed into escrow for potential earn-out payments.[7]  The parties' disputes in this case are based on the release of funds from these escrow accounts.  This opinion addresses only the dispute over the earn-out payment.

## B.     The Earn-Out

The conditions to payment of the earn-out and the calculations of the earn-out amounts are contained in Exhibit D to the Merger Agreement.  Under the agreement, Plaintiff would receive the full $16.8 million earn-out payment if the Company

---

[5] *Id.* ¶ 13.  BPA followed up in writing on October 7, 2021, specifying that the termination would become effective on December 31, 2021.  *Id.* ¶ 32.  *See also* Def.'s Opening Br. Ex. 1 ("Service Agreement").

[6] *Id.* ¶ 13.

[7] *Id.* ¶ 21.

entered into qualifying agreements with Indiana University Health, Inc. ("Indiana") and BPA after the merger closed.[8]

Following the closing of the merger, the Company signed an agreement with Indiana, and Plaintiff received a $10.8 million payment from the escrowed funds.[9] Payment of the remaining $6 million in the earn-out escrow was contingent on the signing of a new or amended agreement with BPA that met specific criteria.[10] Those terms are explained in Section 2(c) of Exhibit D to the Merger Agreement, which states, in pertinent part, that Plaintiff would be paid $6 million:

> If BPA (A) signs a new agreement with any Group Company or an Affiliate of [HPI] with substantially the same economic terms as the Company's existing agreement with BPA but without the early termination clause contained therein, (B) signs an amendment to the Company's existing agreement with BPA that removes the early termination clause contained therein or (C) signs a new agreement with any Group Company or an Affiliate of [HPI] satisfactory to [HPI] in its sole discretion after the Closing.[11]

On December 22, 2021, BPA and AHS executed a document titled: "Agreement to Amend Service Agreement" (the "December Agreement").[12] This

---

[8] Exhibit D also provides for partial earn-out payments based on certain financial metrics in the event that qualifying agreements were not reached with both Indiana and BPA. That provision is not pertinent to the disposition of this motion.

[9] Compl. ¶ 27.

[10] Merger Agreement § 2.9(a)(iii).

[11] *Id.* Ex. D § 2(c). Group Company means any subsidiary of the Company, including AHS. Merger Agreement at 8; *id.* sched. 3.1.

[12] Compl. ¶ 35; Ex. C at 5 ("December Agreement").

one-page document was negotiated by AHS employee J. Paul O'Haro in consultation with HPI's CFO Lori Llewllyn and CEO Pranil Vadgama.[13] The December Agreement incorporated the existing 36-page Service Agreement except as "affected, modified or changed" by the December Agreement.[14] The December Agreement: (1) specifies that it would last no less than one year, with automatic annual renewals, (2) provides for a new fee schedule, (3) eliminates fee-related penalties and quarterly performance incentives, and (4) suspends BPA's prior right to terminate at any time with 90 days' notice until September 30, 2022, thus pushing the early termination option out for a year.[15]

On December 23, 2021, David H. Langsam, AHS's CEO, sent a letter to HPI which attached a copy of the December Agreement and stated that it satisfied Section 2(c)(C), triggering the $6 million earn-out payment. The letter stated that the contract was a "new agreement" that was "satisfactory" to HPI, as evidenced by the countersignature of HPI's wholly owned subsidiary, AHS.[16] On January 17, 2022, HPI responded with a letter denying that the December Agreement satisfied the

---

[13] Compl. ¶ 34.

[14] *See* December Agreement ("All terms and conditions of the agreement not affected, modified or changed by virtue of this Amendment shall remain in full force and effect.").

[15] *Id.*

[16] Compl. ¶ 39; Ex. C at 3.

conditions for the earn-out payment.[17]  On January 25, 2022, Plaintiff sent a more detailed letter to HPI explaining why the December Agreement was a "new agreement" that satisfied Section 2(c)(C).[18]  The letter asserted that HPI had manifested its approval of the contract through communications among AHS and HPI personnel, including HPI's CEO.[19]  Plaintiff pointed out that the December Agreement removed BPA's ability to terminate the contract for the first year, but did not contend that this change would justify payment under Section 2(c)(B) as an amendment that removed the early termination provision.[20]  Plaintiff now argues in the alternative that the December Agreement is an amendment that satisfies 2(c)(B). HPI disputes that the December Agreement satisfies either condition and has not released the remaining $6 million from the earn-out escrow.

C.    Procedural History

Plaintiff initiated this action on February 18, 2022.[21]  Plaintiff filed the operative amended complaint on May 27, 2022.[22]  The Complaint contains three counts.  Count I alleges that HPI's failure to release the $6 million earn-out after

---

[17] Compl. ¶ 41; Ex. D.

[18] Ex. E.

[19] Compl. ¶¶ 43–44; Ex. E.

[20] Ex. E.

[21] Dkt. 1.

[22] Dkt. 15.

receiving notice of the December Agreement breached the Merger Agreement. Count II asserts a breach of contract claim for failure to pay amounts that Plaintiff contends are owed under the working capital adjustment. Count III seeks a declaratory judgment that Plaintiff is entitled to distributions from the amounts held in escrow.

Defendant moved to dismiss the Complaint on June 13, 2022.[23] Defendant's motion sought dismissal of the Complaint for lack of subject matter jurisdiction, arguing that the parties were required to arbitrate the claims under the dispute resolution mechanism in the Merger Agreement. It also moved to dismiss the Complaint under Court of Chancery Rule 12(b)(3) for improper venue. Alternatively, Defendant sought dismissal of Count I under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

The court heard argument on the motion to dismiss on November 7, 2022.[24] On November 22, 2022, the court denied the motion without prejudice and ordered the parties to confer on a schedule for discovery into issues relating to the dispute resolution mechanism.[25] On January 9, 2023, the parties filed a letter informing the court that Defendant was withdrawing its motion to dismiss the Complaint under

---

[23] Dkt. 16.

[24] Dkt. 44.

[25] Dkts. 41, 43.

Court of Chancery Rules 12(b)(1) and 12(b)(3).[26] The parties' letter indicated that the parties disagreed as to whether the court's denial of the motion to dismiss extended to Defendant's motion to dismiss Count I on the merits.[27] The court's ruling on the motion to dismiss focused on the Rule 12(b)(1) and 12(b)(3) motions, effectively deferring decision on the motion to dismiss under Rule 12(b)(6) until the court was assured that it had subject matter jurisdiction to proceed. Now that the Defendant has withdrawn its defenses of lack of subject matter jurisdiction and improper venue, a decision on the Rule 12(b)(6) motion is ripe for consideration.

## II.    ANALYSIS

Count I of the Complaint claims that HPI's failure to release the $6 million earn-out payment after receiving notice that BPA and AHS had signed the December Agreement breached the Merger Agreement. Plaintiff argues that the December Agreement is a new agreement, which triggers the earn-out payment under Section 2(c)(C).[28] Alternatively, Plaintiff argues the December Agreement is an amendment that removed the early termination clause therein, thus triggering the earn-out payment under Section 2(c)(B).[29] Defendant argues that the December Agreement does not satisfy either of those provisions.

---

[26] Dkt. 45.

[27] *Id.*

[28] Compl. ¶ 40.

[29] *Id.* ¶¶ 40, 43, 53.

## A. Standard of Review

On a motion to dismiss for failure to state a claim under Court of Chancery Rule 12(b)(6):

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (internal citations and quotation marks omitted); *accord Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011). "[A] trial court is required to accept only those 'reasonable inferences that logically flow from the face of the complaint' and 'is not required to accept every strained interpretation of the allegations proposed by the plaintiff.'" *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)). "Moreover, a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law." *Malpiede*, 780 A.2d at 1083.

"In order to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard*

*Co.*, 840 A.2d 606, 612 (Del. 2003). The motion before the court turns on the construction of the contracts at issue.

"The proper construction of any contract . . . is purely a question of law." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). "'Delaware adheres to the 'objective' theory of contracts, i.e., a contract's construction should be that which would be understood by an objective, reasonable third party.'" *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)); *accord Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014). When a contract's language is clear and unambiguous, the court will give effect to the plain meaning of the contract's terms and provisions. *Osborn*, 991 A.2d at 1159–60. The contract is to be read as a whole, giving effect to each term and provision, so as not to render any part of the contract mere surplusage. *Id*. at 1159. The court may also look to the grammatical construction of a contract provision to determine its plain meaning. *ITG Brands, LLC v. Reynolds Am., Inc.*, 2017 WL 5903355, at *6 (Del. Ch. Nov. 30, 2017).

Because any ambiguity must be resolved in favor of the nonmoving party, the defendant is not entitled to dismissal under Rule 12(b)(6) unless the construction of the contract on which their theory of the case rests is the "only reasonable construction as a matter of law." *Kahn v. Portnoy*, 2008 WL 5197164, at *3 (Del.

10

Ch. Dec. 11, 2008) (quoting *VLIW Tech.*, 840 A.2d at 615). Ambiguity exists when a contractual provision is reasonably susceptible to different interpretations. *Vanderbilt Income & Growth Assocs. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Rhone-Poulenc*, 616 A.2d at 1196.

### B. Is the December Agreement a New Agreement or an Amendment?

The first question before the court is whether the December Agreement is a "new agreement" or an "amendment" under Section 2(c) of Exhibit D to the Merger Agreement. "As is the Delaware way, I turn to the words the parties agreed to in their contract as the best evidence of their intent." *Pearl City Elevator, Inc. v. Gieseke*, 2021 WL 1099230, at *12 (Del. Ch. Mar. 23, 2021).

Despite the repeated references to the December Agreement as an amendment to the Service Agreement, Plaintiff contends that two features of the December Agreement create ambiguity that cannot be resolved on a motion to dismiss. First, Plaintiff contends that titling the document "Agreement to Amend Service Agreement" injects confusion into the categorization of the December Agreement under Section 2(c) of the Merger Agreement. Second, Plaintiff argues that the December Agreement supplants certain provisions in the Service Agreement. Neither argument has merit.

11

Plaintiff's strained attempt to find ambiguity in the title of the December Agreement ignores the clear intent of the parties and the plain language of the document. The titling of the December Agreement as an "Agreement to Amend" does not create ambiguity. The Service Agreement specifies that any amendments must be in writing and signed by both parties.[30] Like any other amendment to a contract, it must be agreed to by both parties and supported by consideration. *See Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1232 (Del. Ch. 2000) ("Any amendment to a contract, whether written or oral, relies on the presence of mutual assent and consideration."). That the December Agreement is labeled an agreement to amend cannot reasonably be understood to mean that the parties intended it to be a new agreement.

Plaintiff conveniently focuses on the title of the document but ignores the remainder of the agreement. The December Agreement begins, "THIS SECOND AMENDMENT OF SERVICE AGREEMENT ('Amendment'), entered into on December 22, 2021 ('Amendment Date'), modifies the Service Agreement between Brevard Physician Associates ('Client') and AdvantEdge Healthcare Solutions, Inc. ('AHS') dated July 1, 2016, ('Agreement')."[31] The parties to the December

---

[30] Service Agreement § 19(f).

[31] December Agreement.

12

Agreement, including AHS, consistently called the December Agreement an amendment:

> This Amendment shall be incorporated into and become a part of the [Service] Agreement, and all references to the Agreement shall include this Amendment. All terms and conditions of the Agreement not affected, modified or changed by virtue of this Amendment shall remain in full force and effect. In the event of a conflict between the terms and conditions of this Amendment and the terms and conditions of the Agreement, the terms and conditions of this Amendment shall govern.[32]

The structure of the December Agreement also unambiguously reflects that the contracting parties intended to create an amendment to the Service Agreement, not a new agreement. An amendment is an agreement made subsequent to an existing agreement which alters or adds to the existing agreement. Black's Law Dictionary defines an amendment as: "A formal and usu[ally] minor revision or addition proposed or made to a statute, constitution, pleading, order, or other instrument; specif[ically], a change made by addition, deletion, or correction; esp[ecially], an alteration in wording." *Amendment*, Black's Law Dictionary (11th ed. 2019).[33] Thus, by definition, an amendment requires that the thing being amended to continue to exist. *In re Flint Water Cases*, 2021 WL 4898196, at *4

---

[32] *Id.*

[33] Likewise, Black's Law Dictionary defines "amend" as "to correct or make usu[ally] small changes to" or "[t]o change the wording of; specif[ically] to formally alter . . . by striking out, inserting, or substituting words." *Amend*, Black's Law Dictionary (11th ed. 2019).

(E.D. Mich. Oct. 20, 2021) ("The definition and common usage of the term 'amendment' presupposes that a contract already exists."); *see also Joyce v. DLA Piper Rudnick Gary Cary LLP*, 888 N.E.2d 658, 663 (Ill. App. Ct. 2008) ("[E]ach amendment merely modified those terms that differed from the prior agreement, yet did not alter the force and effect of the unaltered terms."). In essence, the key feature of an amendment is that it makes changes to an existing agreement.

By contrast, a new agreement is not contingent on the presence of an existing agreement. Black's Law Dictionary defines "new" as having "recently come into being" or "[b]eginning afresh." *New*, Black's Law Dictionary (11th ed. 2019). Rather than making changes an existing agreement, a new agreement allows the parties to craft their contractual relationship from scratch. *Cf. Acierno v. Branmar*, 1976 WL 3, at \*2 (Del. Ch. Feb. 19, 1976) (noting that "the new agreement contemplated an entirely new arrangement for consummating the purposes of the earlier agreement" despite being titled as an amendment).

The December Agreement provides that "This Amendment shall be incorporated into and become a part of the Agreement, and all references to the Agreement shall include this Amendment."[34] The fact that the December Agreement is incorporated into the Service Agreement and does not displace it confirms that it

---

[34] December Agreement.

14

is an amendment.  The December Agreement is a one-page document that "modifies the Service Agreement between Brevard Physician Associates ('Client') and AdvantEdge Healthcare Solutions, Inc. ('AHS') dated July 1, 2016, ('Agreement')."[35]  It expressly rescinds the termination of the Service Agreement that BPA delivered a few months earlier, reviving the prior agreement.[36]  It alters a few existing provisions, including the fee rates, term, and responsibilities of the parties.[37]  Plaintiff argues that these changes reflected "material <u>new</u> terms" that constitute a new agreement.[38]  Plaintiff cites no authority to support this argument. The one-page December Agreement provides no independent terms for the provision of services.   The December Agreement modifies a few terms of the Service Agreement but acknowledges that all unaltered terms of the 36-page Service Agreement continue to be in effect.  It expressly provides that "All terms and conditions of the Agreement not affected, modified or changed by virtue of this Amendment shall remain in full force and effect."[39]

That structure is incompatible with the assertion that the December Agreement is a "new agreement."  The parties made clear their intent to modify,

---

[35] December Agreement.

[36] *Id.* § A.

[37] *Id.*

[38] Pl.'s Opp'n Br. 31.

[39] December Agreement.

rather than to replace, the Service Agreement, both through the words that they used to describe the document itself and the function of its modifications on the parties' existing contractual relationship. In name and by nature, the December Agreement is an amendment, not a new agreement.

Plaintiff's attempt to cast the December Agreement as a new agreement instead of an amendment ignores the language that the parties used in Section 2(c) of Exhibit D to the Merger Agreement. Section 2(c) provides for payment of the earn-out in the event of a qualifying new agreement with BPA (§ 2(c)(A) and § 2(c)(C)) *or* an amendment to the existing agreement with BPA (§ 2(c)(B)). "Under well-settled canons of construction, the expression of one thing is the exclusion of another and each word should be given meaning and effect by the court." *Obsidian Fin. Gp., LLC v. Identity Theft Guard Sols., Inc.*, 2021 WL 1578201, at *8 (Del. Ch. Apr. 22, 2021). Under this canon, the separate reference to "new agreement" and "amendment" in the Merger Agreement are separate terms that are intended to have different meanings. If the contracting parties viewed "amendment" and "new agreement" as synonymous terms, there would have been no reason to reference them separately. Thus, the December Agreement is not a new agreement as contemplated by Section 2(c). Accordingly, Plaintiff has failed to state a claim for breach of Section 2(c)(C) of Exhibit D to the Merger Agreement.

## C. Does the Amendment Remove the Early Termination Clause in the Service Agreement?

Having determined that the December Agreement is an amendment, the court next turns to whether the December Agreement "removes the early termination clause contained" in the existing Service Agreement.[40] The Service Agreement with BPA contained a section titled "Term" that read:

> The initial term of this Agreement will be for three (3) years (the "Initial Term") from the Effective Date. This Agreement will automatically renew for successive additional two (2) year terms. On July 1, 2017, or at any time thereafter, either party may terminate this agreement without cause by providing the other party written notice of at least ninety (90) days.[41]

Under the December Agreement, the "Term" section "is modified by adding the following paragraph:"

> Notwithstanding the foregoing, the term of the Agreement shall continue until December 31, 2022 ("Amendment Term") and automatically renew annually thereafter. After September 2022, either party may provide the other with at least ninety (90) days advance written notice of termination of this Agreement without cause. This applies to all of CLIENT's Divisions.[42]

Plaintiff argues that this new term provision "entirely supplants" the previous provision and requires the contract to continue until at least September 30, 2022, effectively removing the early termination provision. Defendant counters that the

---

[40] Merger Agreement, Ex. D § 2(c)(B).

[41] Service Agreement § 2.

[42] December Agreement § B.

December Agreement retains the early termination clause contained in the Service Agreement and therefore cannot trigger the earn-out under Section 2(c)(B).

The December Agreement does not delete and replace the prior term provision. This differs from other sections of the Service Agreement, which the December Agreement expressly deleted and replaced with new terms. For example, the December Agreement provides that "Schedule A of the Agreement is modified by deleting the fee table and replacing it with" a new table.[43] By contrast, the December Agreement provides that "Section 2 ('Term') of the Agreement is modified by adding the following paragraph."[44] Reading the contract as a whole and the term provision in context, the December Agreement unambiguously supplements, rather than supplants, the term provision of the Service Agreement.

In function, this supplement alters the previous term provision, suspending BPA's early termination right until at least December 31, 2022. But it does not remove the termination provision. Instead, after December 31, 2022, BPA may still terminate the Service Agreement on the same terms provided under the original Service Agreement: without cause, in writing, and with ninety days advance notice. To remove is not an ambiguous phrase. "To remove" in this context means to

---

[43] *Id.* § D.

[44] *Id.* § B.

eliminate, to delete, or to take out.[45]  The December Agreement did not remove the early termination provision.  Rather, it only delayed BPA's ability to exercise its early termination right until a later date.

Accordingly, the December Agreement does not satisfy Section 2(c) and does not trigger Defendant's obligation to release the earn-out payment.

## III.  CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss Count I for failure to state a claim under Rule 12(b)(6) is hereby GRANTED, with prejudice.

---

[45] *See Remove*, Dictionary.com, https://www.dictionary.com/browse/remove (last visited Apr. 26, 2023) (defining remove as "to move from a place or position," "to take away, withdraw, or eliminate," or "to get rid of; do away with; put an end to."); *Remove*, Merriam-Webster, https://www.merriam-webster.com/dictionary/remove (last visited Apr. 26, 2023) (defining remove as "to change the location, position, station, or residence of" or "to get rid of.").